**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**OFFICE OF THE CLERK**

Alfred A. Arraj
United States Courthouse
901 19th Street
Denver, Colorado 80294
www.cod.uscourts.gov

Jeffrey P. Colwell
*Clerk*

Phone: (303) 844-3433

Date: 6/1/2015

☐ Pro Se      ☒ Retained      ☐ CJA      ☐ FPD

USA or other
☐ Federal Agency
(Appeal Fee Exempt)

Case No: <u>13-cv-00518-RBJ</u>

☐ Amended Notice of Appeal
☐ Other pending appeals
☐ Transferred Successive
§2254 or §2255

Date Filed: <u>05/29/2015</u>

Appellant: <u>Colowyo Coal Company, L.P</u>

Pro Se Appellant:
      ☐ IFP forms mailed/given      ☐ Motion IFP pending      ☐ Appeal fee paid
                                    ☐ IFP denied                ☐ Appeal fee not paid

Retained Counsel:
      ☒ Appeal fee paid      ☐ Appeal fee not paid      ☐ Motion IFP filed

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of Appeals.   Please refer to the forms, procedures, and requirements for ordering transcripts, preparing docketing statements and briefs, and designations of the record that are found on the Tenth Circuit's website, www.ca10.uscourts.gov.

If not already completed, either an appeal fee payment for filing this case or filing of a motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as the Court of Appeals within 14 days after the notice of appeal was filed with the District Court.

If you have questions, please contact this office.

Sincerely,

JEFFREY P. COLWELL, CLERK

by:   s/<u>A. Thomas, Deputy Clerk</u>
         Deputy Clerk

cc:   Clerk of the Court, Tenth Circuit Court of Appeals

Rev. 10/2/2014

ADMAPP,APPEAL,MJ CIV PP,TERMED

## U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13−cv−00518−RBJ

| | |
|---|---|
| WildEarth Guardians v. Klein et al | Date Filed: 02/27/2013 |
| Assigned to: Judge R. Brooke Jackson | Date Terminated: 05/08/2015 |
| Cause: 42:4231 National Environmental Policy Act (NEPA) | Jury Demand: None |
| | Nature of Suit: 893 Environmental Matters |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**WildEarth Guardians**                    represented by    **James Jay Tutchton**
                                                              WildEarth Guardians−Denver
                                                              1536 Wynkoop Street
                                                              Suite 301
                                                              Denver, CO 80202
                                                              720−301−3843
                                                              Email: jtutchton@wildearthguardians.org
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Ashley Dye Wilmes**
                                                              WildEarth Guardians−Louisville
                                                              680 West Hickory Street
                                                              Louisville, CO 80027
                                                              859−312−4162
                                                              Email: awilmes@wildearthguardians.org
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Samantha M. Ruscavage−Barz**
                                                              WildEarth Guardians−Santa Fe
                                                              516 Alto Street
                                                              Santa Fe, NM 87501
                                                              505−988−9126
                                                              Fax: 505−213−1895
                                                              Email: sruscavagebarz@wildearthguardians.org
                                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. Office of Surface Mining**          represented by    **John S. Most**
**Reclamation and Enforcement**                              U.S. Department of Justice−DC−7611
                                                             P.O. Box 7611
                                                             Environment &Natural Resources Division
                                                             Washington, DC 20044−7611
                                                             202−616−3353
                                                             Fax: 202−305−0506
                                                             Email: john.most@usdoj.gov
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Al Klein**                               represented by    **John S. Most**
*in his official capacity as Western*                        (See above for address)
*Regional Director of the Office of*                         *ATTORNEY TO BE NOTICED*
*Surface Mining Reclamation and*
*Enforcement, Denver, Colorado*

**Defendant**

                                           represented by

**S.M.R. Jewell**
*in her official capacity as U.S. Secretary
of the Interior*

**John S. Most**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**Colowyo Coal Company, L.P.**                  represented by  **Stephen D. Bell**
Dorsey &Whitney, LLP−Denver
1400 Wewatta Street
#400
Denver, CO 80202−5549
303−629−3405
Fax: 303−629−3450
Email: bell.steve@dorsey.com
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Trapper Mining Inc.**                          represented by  **Kristina R. Van Bockern**
Holland &Hart, LLP−Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201−8749
303−295−8000
Fax: 720−545−9952
Email: trvanbockern@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Marian Camille Larsen**
Holland &Hart, LLP−Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201−8749
303−295−8430
Fax: 303−291−9177
Email: mclarsen@hollandhart.com
*TERMINATED: 08/06/2014*

**Paul Martin Seby**
Holland &Hart, LLP−Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201−8749
303−295−8430
Fax: 303−291−9177
Email: pmseby@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**San Juan Coal Company**                        represented by  **William C. Scott**
*TERMINATED: 04/22/2014*                         Modrall, Sperling, Roehl, Harris &Sisk,
P.A.
P.O. Box 2168
500 4th Street, N.W.
#1000
Albuquerque, NM 87103−2168
505−848−1824
Fax: 505−848−9710
Email: bscott@modrall.com

*TERMINATED: 04/22/2014*

**Defendant**

**Ken Salazar**
*in his official capacity as U.S. Secretary*
*of the Interior*
*TERMINATED: 03/07/2014*

represented by **John S. Most**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Filed | # | Docket Text |
|---|---|---|
| /2013 | 1 | COMPLAINT *Petition for Review* against All Defendants (Filing fee $ 350, Receipt Number 1082−3247349), filed by Wi Guardians. (Attachments: #1 Civil Cover Sheet, #2 Summons, #3 Summons, #4 Summons, #5 Summons, #6 Summons)(Ruscavage−Barz, Samantha) (Entered: 02/27/2013) |
| /2013 | 2 | Case assigned to Judge John L. Kane. Text Only Entry. (agarc, ) (Entered: 02/28/2013) |
| /2013 | 3 | SUMMONS issued by Clerk. Magistrate Judge Consent Form attached. (Attachments: #1 Summons, #2 Summons, #3 Su Summons, #5 Magistrate Judge Consent Form) (agarc, ) (Entered: 02/28/2013) |
| /2013 | 4 | SUMMONS Returned Executed upon *Federal* defendant(s) U.S. Office of Surface Mining Reclamation and Enforcement 3/6/2013, answer due 5/6/2013. (Ruscavage−Barz, Samantha) (Entered: 03/26/2013) |
| /2013 | 5 | NOTICE of Entry of Appearance *of counsel* by John S. Most on behalf of Al Klein, Ken Salazar, U.S. Office of Surface M Reclamation and Enforcement (Most, John) (Entered: 03/28/2013) |
| /2013 | 6 | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint, by Defendants Al Klei Salazar, U.S. Office of Surface Mining Reclamation and Enforcement. (Attachments: #1 Proposed Order (PDF Only))(Mo (Entered: 04/19/2013) |
| /2013 | 7 | MOTION to Intervene by Defendant Trapper Mining Inc.. (Attachments: #1 Affidavit Exhibit A, #2 Exhibit B, #3 Exhib Exhibit D)(Seby, Paul) Modified on 4/23/2013 as counsel has refiled at 9 .(sgrim) (Entered: 04/23/2013) |
| /2013 | 8 | MINUTE ORDER. Defendants' Unopposed Motion for Enlargement of Time to Respond to the Complaint 6 is GRANTEI shall have up to and including June 3, 2013, to respond to the Complaint, by Judge John L. Kane on 4/23/13.(sgrim) (Enter 04/23/2013) |
| /2013 | 9 | MOTION to Intervene by Defendant Trapper Mining Inc.. (Attachments: #1 Affidavit Exhibit A, #2 Exhibit B, #3 Exhib Exhibit D, #5 Exhibit E, #6 Proposed Order (PDF Only))(Seby, Paul) (Entered: 04/23/2013) |
| /2013 | 10 | ORDER Granting Trapper Mining Inc's 9 Motion to Intervene, by Judge John L. Kane on 4/23/13.(sgrim) (Entered: 04/23/ |
| /2013 | 11 | MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint, by Intervenor Defendant Trapper M (Attachments: #1 Proposed Order (PDF Only))(Seby, Paul) (Entered: 05/08/2013) |
| /2013 | 12 | MINUTE ORDER. Intervenor−Defendant Trapper Mining, Inc.'s Unopposed Motion for Extension of Time, 11 , is GRAN Trapper has up to and including June 3, 2013 to respond to Plaintiff's Complaint by Judge John L. Kane on 05/09/13. Text Entry(jjhsl, ) (Entered: 05/09/2013) |
| /2013 | 13 | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint, by Defendants Al Klei Salazar, U.S. Office of Surface Mining Reclamation and Enforcement. (Attachments: #1 Proposed Order (PDF Only))(Mo (Entered: 05/31/2013) |
| /2013 | 14 | MINUTE ORDER. Federal Defendants' Unopposed Motion for Enlargement of Time, Doc. 13 , is GRANTED. All defend have until a date two weeks after a ruling on federal defendants' planned motion to sever and transfer certain claims to the Wyoming to respond to the Petition for Review of Agency Action in this case. The Court will expect the planned motion t filed on or before June 10, 2013, as represented in the motion. By Judge John L. Kane on 6/3/13. Text Only Entry(mnfsl, ) 6/4/2013 to indicate this is a text only entry(mnfsl, ). (Entered: 06/03/2013) |
| /2013 | 15 | MOTION to Sever *counts 9 through 15*, MOTION to Transfer Case *(counts 9 through 15)* by Defendants Al Klein, Ken Sa Office of Surface Mining Reclamation and Enforcement. (Attachments: #1 Exhibit, #2 Exhibit, #3 Exhibit, #4 Exhibit, # 6 Exhibit, #7 Exhibit, #8 Exhibit, #9 Exhibit, #10 Exhibit, #11 Exhibit, #12 Exhibit, #13 Exhibit, #14 Exhibit, #15 Ex Exhibit, #17 Exhibit, #18 Exhibit, #19 Exhibit, #20 Exhibit, #21 Exhibit, #22 Exhibit, #23 Exhibit, #24 Exhibit, #25 Exhibit)(Most, John) (Entered: 06/07/2013) |
| /2013 | 16 | Unopposed MOTION to Intervene *as a Defendant with Supporting Memorandum of Points and Authorities* by Intervenor l Colowyo Coal Company, L.P.. (Attachments: #1 Affidavit Declaration of Chris McCourt in Support of Colowyo's Motion in Support of Federal Defendants)(Bell, Stephen) (Entered: 06/14/2013) |

| | | |
|---|---|---|
| /2013 | 17 | ANSWER to 1 Complaint, *and Affirmative Defenses of Proposed Intervenor Colowyo Coal Company, L.P.* by Colowyo C Company, L.P..(Bell, Stephen) (Entered: 06/14/2013) |
| /2013 | 18 | CORPORATE DISCLOSURE STATEMENT. (Bell, Stephen) (Entered: 06/14/2013) |
| /2013 | 19 | ORDER granting 16 Colowyo Coal Company, L.P.'s Motion to Intervene. By Judge John L. Kane on 6/17/13.(mnfsl, ) (En 06/17/2013) |
| /2013 | 20 | Unopposed MOTION for Extension of Time to File Response/Reply as to 15 MOTION to Sever *counts 9 through 15* MOT Transfer Case *(counts 9 through 15)* by Plaintiff WildEarth Guardians. (Attachments: # 1 Proposed Order (PDF Only))(Ruscavage−Barz, Samantha) (Entered: 06/19/2013) |
| /2013 | 21 | MINUTE ORDER. Plaintiff's Unopposed Motion for Enlargement of Time to File Response to Defendants' Motion for Sev 20 , is GRANTED. Plaintiff has up to and including July 8, 2013 to respond to the relevant motion. Defendants will then h including July 18, 2013 to file a reply. By Judge John L. Kane on 6/19/13. Text Only Entry(mnfsl, ) (Entered: 06/19/2013) |
| /2013 | 22 | MOTION to Intervene by Intervenor Defendant San Juan Coal Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Scot (Entered: 06/25/2013) |
| /2013 | 23 | MINUTE ORDER. San Juan Coal Company's Motion to Intervene, Doc. 22 , is GRANTED with the same limitations as r therein and as included in Doc. 19 . Parties are ordered confer and submit a Joint Case Management Plan (instructions avai http://www.cod.uscourts.gov/CourtOperations/RulesProcedures/JudicialPracticeStandards/SeniorArticleIIIJudges/HonJohn ) on or before July 8, 2013. Parties should include the timetable for Defendant and Defendant Intervenors to reply to Defer pending Motion for Severance as well as all other deadlines as specified in the JCMP template. By Judge John L. Kane on Text Only Entry(mnfsl, ) (Entered: 06/27/2013) |
| /2013 | 24 | MOTION to Sever *Claims and Transfer Venue* by Intervenor Defendant San Juan Coal Company. (Attachments: # 1 Exhib C)(Scott, William) (Entered: 06/28/2013) |
| /2013 | 25 | ANSWER to 1 Complaint, *Petition for Review of Agency Action* by San Juan Coal Company.(Scott, William) (Entered: 06 |
| /2013 | 26 | Proposed Scheduling Order *Joint Case Management Plan* by Plaintiff WildEarth Guardians. (Ruscavage−Barz, Samantha) 07/08/2013) |
| /2013 | 27 | BRIEF in Opposition to 15 MOTION to Sever *counts 9 through 15* MOTION to Transfer Case *(counts 9 through 15)* filed WildEarth Guardians. (Ruscavage−Barz, Samantha) (Entered: 07/08/2013) |
| /2013 | 28 | BRIEF in Opposition to 24 MOTION to Sever *Claims and Transfer Venue by San Juan Coal Company* filed by Plaintiff W Guardians. (Ruscavage−Barz, Samantha) (Entered: 07/18/2013) |
| /2013 | 29 | REPLY to Response to 15 MOTION to Sever *counts 9 through 15* MOTION to Transfer Case *(counts 9 through 15)* filed Defendants Al Klein, Ken Salazar, U.S. Office of Surface Mining Reclamation and Enforcement. (Most, John) (Entered: 0 |
| /2013 | 30 | NOTICE of Entry of Appearance by Ashley Dye Wilmes on behalf of WildEarth Guardians (Wilmes, Ashley) (Entered: 07 |
| /2013 | 31 | REPLY to Response to 24 MOTION to Sever *Claims and Transfer Venue* filed by Intervenor Defendant San Juan Coal Co (Scott, William) (Entered: 08/01/2013) |
| /2014 | 32 | ORDER. The Motions at Docs. 15 and 24 are granted. Claims 9 through 15 shall be transferred to the District of Wyoming further proceedings and claims 7 and 8 shall be transferred to the District of New Mexico for all further proceedings. Furth order sua sponte that claims 5 and 6 involving the Spring Creek Mine in Montana be transferred to the District of Montana further proceedings. By Judge John L. Kane on 2/7/14.(mfiel, ) (Entered: 02/07/2014) |
| /2014 | 33 | Interdistrict Transmittal of Documents via e−mail to USDC Wyoming at InterdistrictTransfer_WYD@wyd.uscourts.gov, U Mexico at InterdistrictTransfer_NMD@nmd.uscourts.gov, and USDC Montana at InterdistrictTransfer_MTD@mtd.uscou Only Entry (papsl, ) (Entered: 02/07/2014) |
| /2014 | 34 | MINUTE ORDER. The parties are directed to confer and submit a revised Proposed Joint Case Management Plan on or be 10, 2014, by Judge John L. Kane on 2/25/14. Text Only Entry (jlksec, ) (Entered: 02/25/2014) |
| /2014 | 35 | AMENDED COMPLAINT against All Defendants, filed by WildEarth Guardians. (Attachments: # 1 Exhibit Defendant &Defendant−Intervenor Written Consent)(Ruscavage−Barz, Samantha) (Entered: 03/07/2014) |
| /2014 | 36 | Proposed Scheduling Order Revised by Plaintiff WildEarth Guardians. (Ruscavage−Barz, Samantha) Modified on 3/11/20 will re−file as a Notice (klyon, ). (Entered: 03/10/2014) |
| /2014 | 37 | NOTICE *of Revised Case Management Plan* by Plaintiff WildEarth Guardians (Ruscavage−Barz, Samantha) (Entered: 03/ |
| /2014 | 38 | ORDER−Joint case management plan for petitions for review of agency action, by Judge John L. Kane on 3/11/2014. (trle 03/11/2014) |

| /2014 | 39 | Utility Setting/Resetting Deadlines/Hearings: Federal Respondents' and Intervenor−Respondents' Answers due 5/2/2014. V Guardians' Opening Brief due 8/22/2014. Federal Respondents' Response Brief due 9/26/2014. Intervenor−Respondents' R Briefs due 10/10/2014. WildEarth Guardians' Reply Brief due 11/14/2014. text entry only. (trlee, ) (Entered: 03/11/2014) |
| /2014 | 40 | Unopposed MOTION to Withdraw by Intervenor Defendant San Juan Coal Company. (Attachments: #1 Proposed Docum Order)(Scott, William) (Entered: 03/20/2014) |
| /2014 | 41 | MINUTE ORDER. San Juan Coal Company's Unopposed Motion to Withdraw, Doc. 40, is GRANTED. San Juan Coal Co longer a party to the action remaining in Colorado, by Judge John L. Kane on 04/22/14. Text Only Entry(jhawk, ) (Entere 04/22/2014) |
| /2014 | 42 | NOTICE of Change of Address/Contact Information by Paul Martin Seby (Seby, Paul) (Entered: 04/23/2014) |
| /2014 | 43 | ANSWER to 35 Amended Complaint *for Review of Agency Action* by Colowyo Coal Company, L.P..(Bell, Stephen) (Ente 05/02/2014) |
| /2014 | 44 | ANSWER to 1 Complaint, *and Affirmative Defenses in Response to Plaintiff's Amended Petition for Review of Agency Act* Trapper Mining Inc..(Seby, Paul) (Entered: 05/02/2014) |
| /2014 | 45 | *Federal Defendants'* ANSWER to 35 Amended Complaint Attorney John S. Most added to party S.M.R. Jewell(pty:dft) by Jewell, Al Klein, U.S. Office of Surface Mining Reclamation and Enforcement.(Most, John) (Entered: 05/02/2014) |
| /2014 | 46 | NOTICE *of Serving and Lodging the Administrative Record and Certifying Declaration* by Defendants S.M.R. Jewell, Al Salazar, U.S. Office of Surface Mining Reclamation and Enforcement (Attachments: #1 Agency Declaration Certifying A Record)(Most, John) (Entered: 07/18/2014) |
| /2014 | 47 | ADMINISTRATIVE RECORD (Text Only Entry − Available in other format at the Clerk's Office) by Defendants S.M.R. Klein, Ken Salazar, U.S. Office of Surface Mining Reclamation and Enforcement. (jhawk, ) (Entered: 07/21/2014) |
| /2014 | 48 | MOTION to Withdraw as Attorney by Intervenor Defendant Trapper Mining Inc.. (Attachments: #1 Proposed Order (PDF Only))(Larsen, Marian) (Entered: 08/06/2014) |
| /2014 | 49 | ORDER granting 48 Motion to Withdraw as Attorney. Attorney Marian Camille Larsen terminated, by Judge John L. Kane Text Only Entry(jlksec) (Entered: 08/06/2014) |
| /2014 | 50 | PLAINTIFF'S OPENING BRIEF re 47 Administrative Record by Plaintiff WildEarth Guardians. (Attachments: #1 Exhib Declaration)(Ruscavage−Barz, Samantha) (Entered: 08/22/2014) |
| /2014 | 51 | Unopposed MOTION for Extension of Time to *file responding and reply briefs on petition for review of agency action* by S.M.R. Jewell, Al Klein, U.S. Office of Surface Mining Reclamation and Enforcement. (Attachments: #1 Proposed Order Only))(Most, John) (Entered: 09/17/2014) |
| /2014 | 52 | MINUTE ORDER. Federal Defendants' Unopposed Motion for Enlargement of Time, Doc. 51, is GRANTED. Federal De response brief shall be filed by October 2, 2014, Defendant−Intervenors' response briefs shall be filed by October 14, 2014 Plaintiff's reply brief shall be filed by November 17, 2014 by Judge John L. Kane on 09/18/14. Text Only Entry(jhawk, ) ( 09/18/2014) |
| /2014 | 53 | NOTICE of Entry of Appearance by Kristina R. Van Bockern on behalf of Trapper Mining Inc.Attorney Kristina R. Van B added to party Trapper Mining Inc.(pty:intvd) (Van Bockern, Kristina) (Entered: 09/22/2014) |
| /2014 | 54 | Unopposed MOTION for Extension of Time to *Respond to Plaintiff's Opening Brief in Support of its Petition for Review o Action* by Defendants S.M.R. Jewell, Al Klein, U.S. Office of Surface Mining Reclamation and Enforcement. (Attachment Proposed Order (PDF Only))(Most, John) (Entered: 10/01/2014) |
| /2014 | 55 | Minute Order. Federal Defendants' Unopposed Motion for Enlargement of Time, Doc. 54, is GRANTED. Federal Defenda Response brief is due on or before October 7, 2014 and Defendant−Intervenors' Response briefs are due on or before Octo by Judge John L. Kane on 10/01/14. Text Only Entry(jhawk, ) (Entered: 10/01/2014) |
| /2014 | 56 | RESPONSE to 50 Administrative Record − Plaintiffs Opening Brief *Federal Defendants' Brief Responding to Plaintiff's O in Support of its Petition for Review of Agency Action* by Defendants S.M.R. Jewell, Al Klein, U.S. Office of Surface Mini Reclamation and Enforcement. (Attachments: #1 Postle Decl., #2 Nichols Decl. in 10−cv−1174 (D.D.C.), #3 Nichols De 11−cv−1481 (D.D.C.), #4 Nichols Decl. in 12−cv−85 (D. Wyo.))(Most, John) (Entered: 10/07/2014) |
| /2014 | 57 | Utility Setting/Resetting Deadlines/Hearings: Adm Plaintiff Reply Brief due by 11/17/2014. Text Only Entry (jhawk, ) (Er 10/08/2014) |
| /2014 | 58 | RESPONSE to 50 Administrative Record − Plaintiffs Opening Brief *In Support of Its Amended Petition for Review of Age* Intervenor Defendant Trapper Mining Inc.. (Attachments: #1 Exhibit #1 Mattern Declaration, #2 Exhibit #2 Luke Declara Paul) (Entered: 10/20/2014) |

| | | |
|---|---|---|
| /2014 | 59 | BRIEF *on the Merits* by Intervenor Defendant Colowyo Coal Company, L.P.. (Attachments: # 1 Affidavit Declaration of M Drysdale, # 2 Exhibit A − State Findings, # 3 Affidavit Declaration of J. Garcia)(Bell, Stephen) (Entered: 10/20/2014) |
| /2014 | 60 | CERTIFICATE OF COMPLIANCE *With Conferral Requirement* re 59 Brief by Intervenor Defendant Colowyo Coal Com (Bell, Stephen) (Entered: 10/20/2014) |
| /2014 | 61 | NOTICE *of Lodging Correction to the Administrative Record, Adding Inadvertently Omitted Pages* by Defendants S.M.R. Klein, U.S. Office of Surface Mining Reclamation and Enforcement (Attachments: # 1 Exhibit State of Colorados May 4, 2 Proposed Decision and Findings of Compliance for the Colowyo Mine)(Most, John) (Entered: 10/30/2014) |
| /2014 | 62 | Unopposed MOTION for Extension of Time to File Response/Reply as to 47 ADMINISTRATIVE RECORD (Text Only E Available in other format at the Clerk's Office) by Plaintiff WildEarth Guardians. (Ruscavage−Barz, Samantha) (Entered: |
| /2014 | 63 | Plaintiff's Unopposed Motion for Extension of Time, Doc. 62, is GRANTED. Plaintiff's Reply Brief is now due on or befo 21, 2014. Entered by Judge John L. Kane on 11/10/14. Text Only Entry(jhawk, ) (Entered: 11/10/2014) |
| /2014 | 64 | PLAINTIFF'S REPLY BRIEF re 47 Administrative Record by Plaintiff WildEarth Guardians. (Ruscavage−Barz, Samanth 11/21/2014 |
| /2014 | 65 | CASE REASSIGNED. Your AP case is at issue. Pursuant to D.C.COLO.LCivR 40.1 this case is assigned to Magistrate Ju Shaffer. All future pleadings should be designated as 13−cv−00518−CBS. (Text Only Entry) (agarc, ) (Entered: 12/16/201 |
| /2014 | 66 | Magistrate Judge Consent Form issued pursuant to Magistrate Judge Pilot Project to Assign Civil Cases to Full Time Magi (agarc, ) (Entered: 12/16/2014) |
| /2014 | 67 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff WildEarth Guardians. (Ruscavage−Barz, Samantha) (Entered: |
| /2014 | 68 | CASE REASSIGNED pursuant to 67 Consent to Jurisdiction of Magistrate Judge. Consent not achieved. This case is reass Judge Wiley Y. Daniel. All future pleadings should be designated as 13−cv−00518−WYD. (Text Only Entry) (nmarb, ) (E 12/24/2014) |
| /2015 | 69 | MEMORANDUM RETURNING CASE for Reassignment by Judge Wiley Y. Daniel. (rkeec) (Entered: 01/05/2015) |
| /2015 | 70 | CASE REASSIGNED pursuant to 69 Memorandum Returning Case. This case is reassigned to Judge R. Brooke Jackson. A pleadings should be designated as 13−cv−00518−RBJ. (Text Only Entry) (rkeec) (Entered: 01/05/2015) |
| /2015 | 71 | MINUTE ORDER: The Court requests that the parties jointly contact Chambers at Jackson_chambers@cod.uscourts.gov or 844−4694 with 14 days to schedule this matter for a half−day oral argument. By Judge R. Brooke Jackson on 1/30/2015. T Entry (rbjsec. ) (Entered: 01/30/2015) |
| /2015 | 72 | MINUTE ORDER: A half−day Oral Argument is scheduled for April 24, 2015 at 9:00 a.m. in Courtroom A 902 before Jud Brooke Jackson. By Judge R. Brooke Jackson on 2/10/2015. Text Only Entry (rbjsec. ) (Entered: 02/10/2015) |
| /2015 | 73 | NOTICE of Supplemental Authorities re: 50 Administrative Record − Plaintiff WildEarth Gua (Attachments: # 1 Exhibit Supplemental Authroity)(Ruscavage−Barz, Samantha) (Entered: 03/06/2015) |
| /2015 | 74 | COURTROOM MINUTES/MINUTE ENTRY for proceedings held before Judge R. Brooke Jackson: Oral Argument Hear 4/24/2015. Case is TAKEN UNDER ADVISEMENT, written order to issue. Court Reporter: Kara Spitler. (jdyne, ) (Enter 04/24/2015) |
| /2015 | 75 | TRANSCRIPT of Hearing on Pending Motions held on 4−24−15 before Judge Jackson. Pages: 1−116. <br> **NOTICE − REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the co proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electroni available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscour** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to th deadline for electronic posting on PACER. (kspit, ) (Entered: 05/01/2015) |
| /2015 | 76 | NOTICE *Defendants' Joint Notice of Filing Materials Regarding Waiver Defense and Public Participation Claims* by Def S.M.R. Jewell, U.S. Office of Surface Mining Reclamation and Enforcement (Attachments: # 1 Exhibit Complaint in Civil 1:08−cv−02167 (D. Colo.), # 2 Exhibit Excerpt of brief filed in !:14−cv−00112 (D. New Mexico))(Most, John) (Entered: 0 |
| /2015 | 77 | RESPONSE to 76 Notice (Other), by Plaintiff WildEarth Guardians. (Attachments: # 1 Exhibit Transcript Excerpt, # 2 Ex Declaration in 1:08−cv−2167)(Ruscavage−Barz, Samantha) (Entered: 05/04/2015) |
| /2015 | 78 | ORDER re: 47 ADMINISTRATIVE RECORD. by Judge R. Brooke Jackson on 5/8/15. (jdyne, ) (Entered: 05/08/2015) |
| /2015 | 79 | FINAL JUDGMENT in favor of the plaintiff, WildEarth Guardians, and against the defendants and intervenor−defendants of Surface Mining Reclamation and Enforcement, Al Klein, S.M.R. Jewell, Colowyo Coal Company, L.P., and Trapper M Clerk on 5/8/15. (jdyne, ) (Entered: 05/08/2015) |

| /2015 | 80 | NOTICE OF APPEAL as to 79 Judgment, 78 Order by Intervenor Defendant Colowyo Coal Company, L.P. (Filing fee $ 5... Number 1082−4435501) (Bell, Stephen) (Entered: 05/29/2015) |
| /2015 | 81 | MOTION to Stay *Pending Appeal* by Intervenor Defendant Colowyo Coal Company, L.P.. (Attachments: # 1 Affidavit De... fChris McCourt in Support of Motion to Stay Pending Appeal)(Bell, Stephen) (Entered: 05/29/2015) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-00518-RBJ

WILDEARTH GURADIANS,

     Plaintiff,

v.

UNITED STATES OFFICE OF SURFACE MINING, RECLAMATION AND
ENFORCEMENT,
AL KLEIN, in his official capacity as Western Regional Director of the Office of Surface
Mining, Reclamation and Enforcement, Denver, Colorado, and
S.M.R. JEWELL, in her official capacity as U.S. Secretary of the Interior,

     Federal Defendants,

COLOWYO COAL CO. L.P. and TRAPPER MINING, INC.,

     Defendant-Intervenors.

---

## ORDER

---

     This case concerns whether the United States Office of Surface Mining, Reclamation, and

Enforcement ("OSM"), the Western Regional Director of OSM, and the Secretary of the Interior

complied with the National Environmental Policy Act ("NEPA") when they approved two

mining plan modifications.  The plaintiff contends that the defendants failed to comply with

either of NEPA's primary requirements – they neither involved the public nor took a hard look at

the environmental impacts of the proposed modifications.  Based on a review of the briefs and

relevant filings as well as the positions taken during oral argument, the Court agrees.  However,

for reasons explained later, the Court does not agree with all of the aspects of the remedy

advocated by the plaintiff.

## I.   BACKGROUND

### A.  The Parties

The plaintiff, WildEarth Guardians (hereinafter "Guardians"), is a non-profit membership organization with over 43,000 members.  Guardians and its members are "dedicated to protecting and restoring the wildlife, wild places, and wild rivers of the American West."  Amended Petition for Review of Agency Action [ECF No. 35] ¶ 8.  In furtherance of these goals, they "work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate."  *Id.*  Guardians alleges that some of its members live, work, recreate, and conduct other activities on lands affected by the mining plan approvals at issue in this case.  *Id.* ¶ 9.  These individuals "have a substantial interest in ensuring they breathe the cleanest air possible," as well as keeping "intact ecosystems free from permanent contamination of riverine habitats that destroy fish populations."  *Id.*  Guardians claims that its members are "harmed by the aesthetic and environmental impacts of coal mining" at the two locations at issue in this case.  *Id.*

The Secretary of the United States Department of the Interior is the ultimate decisionmaker with respect to mining plans.  OSM, a bureau within the Department, has the initial responsibility for evaluating the environmental impacts of proposed mining plans or revisions of such plans and for making recommendations to the Secretary.  Al Klein and S.M.R. Jewell are being sued in their official capacities as the Western Regional Director of OSM and the Secretary of the Interior, respectively.  Although OSM and the Secretary perform unique functions – the former recommends an action while the latter decides which action to take – both are responsible for ensuring compliance with NEPA.  The two intervenor-defendants, Colowyo

Coal Company, LP and Trapper Mining, Inc., are the companies that petitioned for and received the mining plan modifications at issue in this case.

As noted earlier, Guardians challenges the approval of both mining plan modifications on the basis that OSM failed to comply with NEPA's public notice and hard look requirements. Before discussing the substance of these arguments, I briefly summarize the laws applicable to this case, then address various procedural issues raised by the defendants and intervenors, and finally turn to the merits of the NEPA claims.

**B.  Relevant Laws**

NEPA is a procedural statute designed to ensure public participation and transparent decisionmaking by federal agencies.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Federal agencies must gather public input about a proposed action so that its consequences may be studied before it is undertaken.  *See, e.g.*, 42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).  "By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check those decisions." *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 703 (10th Cir. 2009).  These procedural requirements are not mere formalities.  As expressed by the Tenth Circuit, "NEPA places upon federal agencies the obligation to consider every significant aspect of the environmental impact of a proposed action.  It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1177–78 (10th Cir. 2008) (internal quotation and citations omitted).

The Mineral Leasing Act governs the leasing of public lands for developing deposits of federally owned coal, petroleum, natural gas, and other minerals.  The Act provides that "[p]rior to taking any action on a leasehold which might cause a significant disturbance of the environment, the lessee shall submit for the Secretary's approval an operation and reclamation plan.  The Secretary shall approve or disapprove the plan or require that it be modified."  30 U.S.C. § 207(c).

OSM is tasked with implementing and enforcing the Surface Mining Control and Reclamation Act of 1977 ("SMCRA").  It is "a comprehensive statute designed to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.'"  *See Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 268 (1981) (quoting 30 U.S.C. § 1202(a)).  Under SMCRA, a state may enter into a cooperative agreement with the Secretary to provide for its own regulation of surface coal mining and reclamation operations on federal lands within the state.  *See* 30 U.S.C. § 1273(c).  However, the Secretary may not delegate to the state her responsibility to approve mining plans.  *See id.*; 30 C.F.R. § 745.13(i).  The Secretary likewise cannot delegate her duty to comply with NEPA.  *See* 30 C.F.R. § 745.13(b).  Pursuant to such a cooperative agreement, Colorado has had primary jurisdiction over the regulation of surface coal mining within its borders since 1980, exercising its authority through the Colorado Division of Reclamation, Mining and Safety ("CDRMS").  *See* 30 C.F.R. § 906.10.  The Secretary of the Interior, however, maintains ongoing authority to oversee Colorado's implementation of its regulatory program.  *See, e.g.*, 30 U.S.C. § 1271(b).

OSM makes recommendations to the Secretary of the Interior as to whether mining plans should be approved, disapproved, or conditionally approved contingent upon modifications.  30

C.F.R. § 746.13.  At a minimum, a mining plan must be compliant with the applicable

requirements of federal laws, regulations, and executive orders, with the information contained

therein prepared in compliance with NEPA.  *Id.*  The Secretary heavily relies on OSM in

ensuring she is adequately informed before approving a mining plan.  However, her independent

judgment is still required, and no surface mining or reclamation operations may begin without

her approval.  *See* 30 C.F.R. § 746.11(a); *S. Utah Wilderness Alliance v. Office of Surface

Mining Reclamation & Enforcement*, 620 F.3d 1227, 1243 (10th Cir. 2010).

"An approved mining plan shall remain in effect until modified, cancelled or withdrawn

and shall be binding on any person conducting mining under the approved mining plan." 30

C.F.R. § 746.17(b).  If a lessee seeks to extend coal mining and reclamation operations onto

previously unmined federal lands, a mining plan modification is required.  30 C.F.R. §

746.18(d).  The portion of the modified plan addressing new land areas is subject to the full

standards applicable to new applications for mining leases under SMCRA.  30 U.S.C. §

1256(d)(2).

## C. **The Agency Decisions**

There are two mines whose mining plan modifications are at issue in this case: the

Colowyo Mine and the Trapper Mine.[1]

### Colowyo

The Colowyo Mine, which is located approximately twenty-eight miles south of Craig,

Colorado, has been in operation since 1977.  It obtained its first state mining permit from the

state agency, CDRMS, in 1982.  The Secretary of the Interior approved the Colowyo Mine's first

---

[1] Because this case concerns two agency decisions, the Court cites to the administrative record related to the Colowyo Mine as "COLOWYO" followed by the page number and to the administrative record related to the Trapper Mine as "TRAPPER" followed by the page number.

mining plan for federal coal in 1983.  Since this time, the Secretary has approved three mining

plan modifications, not including the one presently at issue.

At issue here, on July 3, 2006, Colowyo submitted a permit application package to

CDRMS seeking a permit revision to federal coal leases C-0123476, C-29225, and C-29226.

The permit revisions increased the approved mining area by 6,050 acres, adding 5,219 acres of

federal coal for recovery.  The revisions did not extend the life of the mine.[2]

During the state permitting process, Colowyo published notice of its permit application

package in two local newspapers, the *Craig Daily Press* and the *Herald Times*, for four

consecutive weeks ending on August 18, 2006.  COLOWYO 5.  CDRMS then published notice

of its proposed decision to approve the permit revision on May 4, 2007, which began a thirty-day

public comment period.  No requests were received for a public hearing, and CDRMS approved

the permit revision on June 8, 2007.  COLOWYO 8.

Meanwhile, Colowyo notified OSM of its permit revision application.  In reviewing the

application, OSM concluded that a mining plan modification was needed because of the change

in location and amount of federal coal to be mined.  OSM prepared an Environmental

Assessment ("EA") entitled *Supplemental Environmental Assessment for Colowyo Mine Federal

Coal Leases C-0123476, C-29225, and C-29226* ("Colowyo EA").  The Colowyo EA referenced

older NEPA and non-NEPA documents and concluded that the modification would not result in

significant environmental impacts.  Accordingly, OSM issued a Finding of No Significant

Impact ("FONSI") on May 8, 2007.  COLOWYO 12.  OSM recommended that the mining plan

modification be approved, and on June 15, 2007 the Assistant Secretary of the Interior (acting on

---

[2] Although the plaintiff contends that the modifications extended the life of the mine by eleven years, a
review of the administrative record shows that the life of mining operations was anticipated to continue
for eleven years prior to approval of the modifications, which were expected to have no impact on the
mine's longevity.  *See* COLOWYO 2–3, 11.

6

behalf of the Secretary) adopted the recommendation.  COLOWYO 7.  Thus, the modification

under review in this case was approved nearly six years before the present case was filed and

approximately eight years before the present date.

    <u>Trapper</u>

    The Trapper Mine, which is located approximately six miles south of Craig, Colorado,

has been in operation since 1976.  It obtained its first state mining permit from CDRMS in 1982

and received the Secretary's approval of its first mining plan for federal coal in 1983.  Since this

time, the Secretary has approved one mining plan modification, not including the one presently

at issue.

    On November 5, 2007, Trapper submitted a permit application package to CDRMS

seeking a permit revision to federal coal leases C-07519 and C-079641.  The permit revisions

anticipated recovery of approximately 8.1 million tons of federal coal, disturbing 312 acres of

land previously affected by a landslide.  The revisions did not increase the life of the mine.

    During the state permitting process, Trapper first published notice of its permit

application package and the opportunity to comment in the *Craig Daily Press* on February 19,

2009.  TRAPPER 15; [ECF No. 58 at 10 n.3].[3]  Additional notices were published in the same

newspaper four times in July 2009.  *Id.*  CDRMS then published notice of its proposed approval

on or around September 24, 2009.  *See* TRAPPER 13, 15.  On October 23, 2009, after no

comments or requests for a public hearing were received, CDRMS approved the permit revision.

*See id.*

    At the same time, Trapper notified OSM of its permit revision application.  As with the

Colowyo Mine, OSM concluded that the Trapper permit revisions necessitated a mining plan

modification because of the change in location and amount of federal coal to be mined.  OSM

---

[3] The administrative record accidentally reflects that Trapper published notice in the *Steamboat Pilot*.

prepared an EA entitled *Supplemental Environmental Assessment for the Trapper Mine Federal Coal Leases C-07519 and C-079641* ("Trapper EA").  The Trapper EA, like the Colowyo EA, referenced older NEPA and non-NEPA documents to conclude that the modification would not result in significant environmental impacts.  On October 26, 2009, OSM issued a FONSI and recommended that the modified mining plan be approved.  On November 27, 2009, the Assistant Secretary of the Interior (acting on behalf of the Secretary) approved the mining plan.  This approval occurred just over three years before the filing of the present suit and about five and a half years before today.

OSM gave no public notice and sought no public input while drafting the Colowyo and Trapper EAs.  After completing them, OSM placed both EAs and their related FONSIs in its public reading room located in Denver, Colorado without providing notice that it had done so.

### D. **Guardians' Challenges**

Guardians challenges the approval of these mining plan modifications on two grounds. First, it contends that OSM violated NEPA by failing to seek public involvement during the review process and by failing to publish notice of the resulting EAs and FONSIs.  Second, it argues that OSM failed to take a "hard look" at the environmental impacts of the proposed expansions before issuing the FONSIs and approving the mining plans, also in violation of NEPA.

The plaintiff seeks the following relief: (1) a declaration that the government defendants violated NEPA and the APA; (2) an order vacating and remanding the approval of both mining plan modifications; (3) an order enjoining the government defendants from reissuing the mining plan modification approvals until such time as they have demonstrated compliance with NEPA and the APA; (4) an order requiring the government defendants to inform the intervenor-

defendants that their mining plan authorizations have been vacated, and that new operations at

the mines are prohibited until the government defendants have demonstrated compliance with

NEPA and the APA; and (5) plaintiff's costs of litigation, reasonable attorney's fees pursuant to

the Equal Access to Justice Act, 28 U.S.C. § 2412, and such additional relief as the Court deems

proper.

## II.   <u>ANALYSIS</u>

Judicial review of agency compliance with NEPA is deferential. *See Marsh*, 490 U.S. at

377. By law, this Court may only set aside an agency's decision if, after a review of the entire

administrative record, the Court finds that the decision was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Davis v.*

*Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002).

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to
> consider an important aspect of the problem, (2) offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product of agency
> expertise, (3) failed to base its decision on consideration of the relevant factors, or
> (4) made a clear error of judgment. Deficiencies . . . that are mere "flyspecks"
> and do not defeat NEPA's goals of informed decisionmaking and informed public
> comment will not lead to reversal.

*New Mexico ex rel. Richardson*, 565 F.3d at 704 (internal quotation marks and citations omitted).

The plaintiff bears the burden of proof on the question of whether an agency's decision

was arbitrary or capricious. *See Krueger*, 513 F.3d at 1176 (explaining that the agency's

decision is presumed valid). This Court cannot substitute its own judgment for the agency's

judgment. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 555

(1978). "[D]eference to the agency is especially strong where the challenged decisions involve

technical or scientific matters within the agency's area of expertise." *Wyoming v. U.S. Dep't of*

*Agric.*, 661 F.3d 1209, 1246 (10th Cir. 2011) (quoting *Morris v. U.S. Nuclear Regulatory*

*Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010)).

However, the Court must make a searching review of the basis for the agency's decision.

And, if the agency simply has not acted, such as the claim that the OSM provided no public

notice or opportunity for public involvement with respect to its actions on the two mining plan

revisions, the Court may not "defer to a void." *Or. Natural Desert Ass'n v. Bureau of Land*

*Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010).

### A. <u>Standing</u>.

"[T]he core component of standing is an essential and unchanging part of the case-or-

controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992). Standing has three basic elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) actual or
> imminent, not conjectural or hypothetical. Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to
> be fairly traceable to the challenged action of the defendant, and not the result of
> the independent action of some third party not before the court. Third, it must be
> likely, as opposed to merely speculative, that the injury will be redressed by a
> favorable decision.

*Id.* at 560–61 (internal citations, quotation marks and alterations omitted).

OSM argues that Guardians lacks organizational standing to challenge the mining plan

approvals because it has not sufficiently alleged an injury in fact. In the alternative, Trapper

contends that Guardians lacks standing because the alleged harms are non-redressable. In

response, Guardians insists that it has met all of the Article III standing requirements: OSM's

failure properly to analyze the environmental impacts of the mine expansions increases the risk

that Guardians' members will suffer harm to their aesthetic and recreational interests when they

use the public lands in the vicinity of the mines; the increased risk of harm is fairly traceable to

this omission; and the risk of harm would be redressed by a Court order requiring OSM and the Secretary to undergo a proper environmental analysis under NEPA.  The Court agrees with the plaintiff that the conditions for standing have been met.

1. <u>Injury in Fact</u>.

"The 'risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation' by the acting federal agency." *Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir.1989) (Breyer, J.)).  In turn, "when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Com. of Mass. v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983) (Breyer, J.).

As such, a NEPA plaintiff need only show "1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent environmental harm; and 2) that this increased risk of environmental harm injures [the plaintiff's] concrete interest." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002).  Of course, "a plaintiff must also show that it is among the injured." *Diné Citizens Against Ruining our Env't v. Klein*, 747 F. Supp. 2d 1234, 1244 (D. Colo. 2010).  Where the plaintiff is an organization, the plaintiff-organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

OSM contends that Guardians has not established an injury in fact because the declaration of Jeremy Nichols, an employee and member of Guardians, fails to show

affirmatively and clearly that Mr. Nichols used the lands affected by the mining expansions, especially prior to the agency decisions.  I disagree.

According to Mr. Nichols, he began visiting the public lands near the Colowyo and Trapper mine sites and the Craig generating station in approximately 1999.  He has visited the lands around Craig at least once a year since 2005.  He and his family visit these areas to camp, hike, view wildlife, and float the Yampa River.  He states that during his visits he has observed the mines and their infrastructure, heavy equipment, reclamation activities, and dust generated from these activities.  He also sees the rail line to Craig and smoke from the smokestacks of the power plant.  He claims that the enjoyment of his recreational activities is lessened by visible air pollution, concerns about the effect on water quality of discharges into the Yampa River, and noise from "all this industrial activity."  Nichols Decl. [ECF No. 50-1] at ¶¶ 19–23.

The Court is not persuaded that Mr. Nichols' averments concerning the areas he visited are too generalized or too broad, or that he did not claim to have visited the affected areas prior to the approval of the mining plan modifications at issue in this case.[4]  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996) (explaining that NEPA was designed to protect a certain "zone of interests" including recreational, aesthetic, and consumptive interests in land and water).  "Neither [the Tenth Circuit] nor the Supreme Court has ever required an environmental plaintiff to show it has traversed each bit of land that will be

---

[4] This Court has neither accepted nor rejected the proposition that an environmental plaintiff must have used the affected lands *prior to* the challenged decision in order to have standing.  It is not material to the outcome in this case.

affected by a challenged agency action." *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143,

1155 (10th Cir. 2013). "A plaintiff who has repeatedly visited a particular site, has imminent

plans to do so again, and whose interests are harmed by a defendant's conduct has suffered

injury in fact that is concrete and particularized." *Id.* at 1156. Using lands within view of the

affected area may establish injury-in-fact when the aesthetic and recreational values of the lands

would be harmed by the challenged activities.

    2. Redressability.

    Trapper contends that Guardians' injury is nonredressable because its mining activities

are substantially complete such that vacatur and remand of the approved mining plans would not

redress the injury. This argument more aptly sounds in mootness, not redressability. The

doctrine of standing, unlike mootness, addresses "whether, at the inception of the litigation, the

plaintiff had suffered a concrete injury that could be redressed by action of the court." *Utah

Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1263 (10th Cir. 2004). As of

October 15, 2014, Trapper was still mining coal under its permit revision. *See* Mattern Decl.

[ECF No. 58-1] ¶ 22. Therefore, at the time of filing – February 27, 2013 – the plaintiff's

injuries were certainly redressable through vacatur and remand.

    **B.  Mootness.**

    Standing and mootness are closely related but distinct doctrines. "The Supreme Court

has described the doctrine of mootness as 'the doctrine of standing set in a time frame: The

requisite personal interest that must exist at the commencement of the litigation (standing) must

continue throughout its existence (mootness).'" *Utah Animal Rights Coal.*, 371 F.3d at 1263

(quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68, n.22 (1997)). "'In deciding

whether a case is moot, the crucial question is whether granting a present determination of the

issues offered will have some effect in the real world.  When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot.'" *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) (quoting *Kansas Judicial Review v. Stout*, 562 F.3d 1240, 1246 (10th Cir. 2009)).  "A federal court has no power to give opinions upon moot questions or declare principles of law which cannot affect the matter in issue in the case before it."  *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (citing *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992)).

"Ordinarily, a NEPA claim no longer presents a live controversy when the proposed action has been completed and when no effective relief is available."  *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 428 (10th Cir. 1996).  "However, courts still consider NEPA claims after the proposed action has been completed when the court can provide some remedy if it determines that an agency failed to comply with NEPA."  *Id.* at 428–29.

Trapper and Colowyo argue that this case is moot because their projects are either complete or substantially complete such that vacating and remanding the permit approvals would have no effect but to delay mine reclamation.  I agree that vacatur makes no sense as to the Trapper mine: the coal that is the subject of the plan revision at issue has been removed.  However, even as to Trapper, the matter is not entirely moot.  At a minimum the Court can, and in this order does, address declaratory relief.

The status of mining at the Colowyo mine is different.  There are approximately 12 million tons of coal subject to the mining plan revision that have yet to be removed, although the infrastructure that accounts for part of the environmental harm apparently has been completed.  Obviously, this Court could stop the mining at Colowyo as well as provide declaratory relief.

In short, I do not find that the matter is constitutionally moot.  Even if a case is not

constitutionally moot, however, the Court can dismiss the case as prudentially moot if it "is so

attenuated that considerations of prudence and comity for coordinate branches of government

counsel the court to stay its hand, and to withhold relief it has the *power* to grant." *Rio Grande*

*Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010) (emphasis in

original) (quotation marks and citation omitted).  However, it is within the court's discretion

whether to dismiss a claim on the grounds of prudential mootness.  *Hillsdale Envtl. Loss*

*Prevention, Inc. v. U.S. Army Corps. of Eng'rs*, 702 F.3d 1156, 1167 (10th Cir. 2012).

Exercising its discretion, the Court declines to dismiss the plaintiff's case on the grounds of

prudential mootness.

### C.  Doctrine of Laches.

The Court also disagrees that the doctrine of laches applies.[5]  The question of laches,

which depends upon the facts and circumstances of each case, "is primarily left to the discretion

of the trial court, but that discretion is, of course, confined by recognized standards." *Jicarilla*

*Apache Tribe v. Andrus*, 687 F.2d 1324, 1338 (10th Cir. 1982).  In order to dismiss an action

based on laches, a trial court must find both "(a) unreasonable delay in bringing suit by the party

against whom the defense is asserted and (b) prejudice to the party asserting the defense as a

result of this delay." *Id.*  Importantly, however, "[i]n litigation brought under environmental

federal statutes, laches 'is disfavored because of the interests of the public in environmental

quality and because the agency would escape compliance with NEPA if laches were generally

---

[5] Although Trapper contends that the plaintiff's claims are barred under both the doctrines of laches and
waiver, no legal framework was submitted on the doctrine of waiver.  Therefore, the Court reviews the
basis for dismissal only under the doctrine of laches, which is argued by both Trapper and Colowyo.

applied, thus defeating Congress' environmental policy.'" *Biodiversity Conservation Alliance v.*

*Jiron*, 762 F.3d 1036, 1092 (10th Cir. 2014) (quoting *Jicarilla*, 687 F.2d at 1337–38).

Evidently, there was a delay of several years between the approvals of the mining plan

revisions and the filing of this lawsuit. However, that cannot be blamed on Guardians. OSM did

not comply with its most basic NEPA duty of providing public notice. Upon learning of the

mining plan approvals, Guardians put their petition together and filed it reasonably promptly.[6]

Nor am I persuaded that Colowyo and Trapper were unduly prejudiced by the "delay" in the

filing of the suit. Colowyo states that if mining in the revision area had been suspended early on,

Colowyo could have continued to mine coal in a previously permitted area while the legal issues

were hashed out. The fact remains, however, that both Trapper and Colowyo have mined coal in

the revision area since the revisions were approved. Considering both delay and prejudice (and

the remedy discussed below), the Court does not find that the equitable defense of laches is

applicable.

### D.  Doctrine of Forfeiture.

Similarly to the laches defense put forward by the intervenor-defendants, OSM insists

that Guardians forfeited its right to bring its claims because it played no role in the state

proceedings leading up to the approvals. But, even if Guardians was aware of the state

---

[6] In his declaration, Mr. Nichols states that he first "fully" learned of OSM's and the Secretary's roles in approving the mining of federally leased coal in early 2012. Nichols Decl. [ECF No. 50-1] ¶ 6. Previously he had presumed that coal mining under SMCRA was "largely" delegated to states to permit and regulate. *Id.* He learned of the "full scope of responsibility" of OSM and the Secretary in March 2012 when he obtained an EA prepared by OSM for a site in Wyoming. *Id.* ¶ 7. However, during the hearing counsel for Colowyo called to the Court's attention a complaint filed by Guardians in 2008 (in support of which Mr. Nichols provided a declaration) in which Guardians appeared to understand quite well the roles of OSM and the Secretary in this process. After the hearing the government and the intervenor-defendants jointly filed a copy of that complaint as a supplement to their earlier briefing. [ECF No. 76-1]. This filing triggered a response in which Guardians essentially reiterates that because OSM did not provide public notice of its actions in the present case, the laches defense does not apply. I agree with that conclusion, but it misses the Court's point, which I expressed during the hearing. It is not appropriate to create a misleading impression – here that Mr. Nichols did not understand OSM's and the Secretary's roles in the mining plan approval process until 2012 – by parsing words.

16

proceedings – a proposition supported by no evidence in the record – it certainly did not forfeit

its right to be notified of the *federal* administrative process.  What occurred at the state level is

no excuse for OSM's failure to do its job, which included giving Guardians and other members

of the public the opportunity to be involved at the federal level.

### E.  Merits.

Because there are no procedural bars to hearing this case, the Court now addresses the

merits of the plaintiff's arguments.  Guardians contends that OSM violated NEPA in two distinct

ways when approving the Colowyo and Trapper mining plan modifications: (1) failing to ensure

that the public was appropriately involved in and notified about the mining plan approvals and

(2) failing to take a hard look at certain direct and indirect environmental impacts prior to issuing

the FONSIs.[7]

#### 1. Public Involvement and Notice

OSM did not comply with its public notice and involvement obligations in two distinct

ways.  First, it failed to notify the public of and involve the public in its review of the permit plan

modifications.  It then proceeded to issue a completed EA and Finding of No Significant Impact

("FONSI") for each site without notifying the public of their availability.  Each of these

omissions is in violation of NEPA.

Agencies must "[p]rovide public notice of NEPA-related hearings, public meetings, and

the availability of environmental documents so as to inform those persons and agencies who may

be interested or affected."  40 C.F.R. § 1506.6(b).  They must "[e]ncourage and facilitate public

involvement in decisions which affect the quality of the human environment."  40 C.F.R. §

---

[7] I focus, as the parties have, on defendant OSM because OSM is the agency charged with conducting the
environmental investigation and preparing, as appropriate, either an Environmental Assessment or an
Environmental Impact Statement.  In doing so, I do not ignore or diminish the fact that the Secretary
could not properly approve OSM's recommendation if OSM had not fully complied with NEPA.

1500.2(d).  In doing so, NEPA ensures "that 'the most intelligent, optimally beneficial decision

will ultimately be made.'"  *Or. Natural Desert*, 625 F.3d at 1100 (quoting *Calvert Cliffs'*

*Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)).

Notice does not foster involvement unless environmental information is available to public

officials and citizens *before* decisions are made and *before* actions are taken."  40 C.F.R. §

1500.1(b) (emphasis added).

   Even when only an EA is prepared,[8] agencies are still required, "to the extent

practicable," to involve environmental agencies, applicants, and the public in the preparation of

the EA.  40 C.F.R. § 1501.4(b).  Thus, while a draft EA need not be circulated for public

comment, the agency must make "a meaningful effort to provide information to the public

affected by an agency's actions."  *Diné Citizens*, 747 F. Supp. 2d at 1262; *see also Bering Strait*

*Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 953 (9th Cir.

2008) ("An agency, when preparing an EA, must provide the public with sufficient

environmental information, considered in the totality of circumstances, to permit members of the

public to weigh in with their views and thus inform the agency decision-making process.").

Although what constitutes "the extent practicable" will differ in each case, here OSM made no

effort whatsoever to solicit public involvement before decisions were made and actions were

taken.  Inaction of this sort is in clear violation of NEPA.  As the Ninth Circuit has explained,

> Although we have not established a minimum level of public comment and
> participation required by the regulations governing the EA and FONSI process,
> we clearly have held that the regulations at issue must mean something.  It is
> evident, therefore, that a complete failure to involve or even inform the public
> about an agency's preparation of an EA and a FONSI, as was the case here,
> violates these regulations.

---

[8] *See infra* Part II.E.2 for distinction between EAs and Environmental Impact Statements.

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003) (internal

citation omitted).

Furthermore, pursuant to federal regulations OSM "must notify the public of the

*availability* of an environmental assessment and any associated finding of no significant impact

once they have been completed."  43 C.F.R. § 46.305(c) (emphasis added).  OSM did no such

thing.  Instead, it silently placed hard copies of its completed EAs and FONSIs on a shelf in its

high-rise office here in Denver.  OSM made no effort to notify the public of the existence of

these documents, which renders their availability meaningless.[9]

2. "Hard Look" Review

The methods used in surface mining – blasting and the use of draglines, front-end

loaders, and haul trucks – generate particulate matter and ozone precursors.  Ozone and

particulate matter are two of six "criteria" pollutants considered harmful to public health and the

environment for which the Environmental Protection Agency ("EPA") has established National

Ambient Air Quality Standards ("NAAQS") under the Clean Air Act ("CAA").  *See* 40 C.F.R. §

50.1 *et seq.*  Likewise, the combustion of coal impacts the environment through the release of

pollutants and an increase in greenhouse gas emissions.  *See, e.g.*, *Headwaters Res., Inc. v.

Illinois Union Ins. Co.*, 770 F.3d 885, 898 (10th Cir. 2014); *High Country Conservation

Advocates v. United States Forest Serv.*, 52 F. Supp. 3d. 1174, 1194 (D. Colo. 2014).  Guardians

---

[9] In the alternative, OSM argues that any error in failing to notify the public of the availability of the
environmental documents was harmless.  The harmless error rule precludes reversal of administrative
proceedings unless the plaintiff can show it was prejudiced by the alleged error.  *See Bar MK Ranches v.
Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993).  For example, if the party challenging an agency's failure to
provide public notice of an EA otherwise knew of and had access to the EA, there can be no prejudice.
*See Friends of Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1557 (2d Cir. 1992).  In this case, however,
Guardians remained unaware of the EAs and FONSIs for years.  And it only became aware of them after
significant mining activities had been completed.  There is no denying that Guardians has been deprived
of its opportunity to "reach to the effects of [the] proposed action[s] at a meaningful time," before many
millions of tons of coal were mined.  *Marsh*, 490 U.S. at 371.  What's more, all of the defendants have
moved for dismissal of this suit on the grounds that there has been too much delay to justify the relief
sought.  If anything, the prejudice from the lack of notice appears to be great.

maintains that OSM had a duty to take into account the direct and indirect effects of these

pollutants when preparing its EAs and before issuing its FONSIs.  OSM responds that it took a

hard look at these effects or, in the alternative, that it was under no such obligation.

While NEPA does not fix substantive outcomes, it requires federal agencies to take a

"hard look" at the potential environmental consequences of their actions.  *Robertson*, 490 U.S. at

350.  In turn, NEPA requires federal agencies to prepare an Environmental Impact Statement

("EIS") for all "major Federal actions significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(C).  As an alternative or precursor to an EIS, an agency may

prepare an EA to "[b]riefly provide sufficient evidence and analysis for determining whether to

prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. §

1508.9(a)(1).  The EA, while typically a more concise analysis than an EIS, must still evaluate

the "need for the proposal, . . . alternatives as required by [NEPA] section 102(2)(E), [and] the

environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9(b).

Importantly, the "hard look" requirement applies equally to an EA as it does to an EIS.  *See, e.g.*,

*Colorado Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1207–11 (D. Colo.

2011) *amended on reconsideration,* No. 08-CV-01624-WJM-MJW, 2012 WL 628547 (D. Colo.

Feb. 27, 2012); *Diné Citizens*, 747 F. Supp. 2d at 1256–57.  If the agency concludes that the

action will not significantly impact the environment, it may issue a FONSI.  40 C.F.R. §

1508.13.

OSM prepared short, four-page EAs for both the Colowyo and Trapper Mine

applications.  COLOWYO 13-16; TRAPPER 681–84.  The Colowyo EA purports to supplement

seven previous studies and EAs prepared by BLM and OSM over the last two to four decades,

with dates ranging from 1975 to 2001.[10]   COLOWYO 15.   OSM explains that these "previously

prepared environmental documents identify and discuss the environmental impacts of leasing

and mining the coal resources in Federal leases C-0123476, C-29225, and C-29226," although no

citations are provided in support of this declaration.[11]   *Id.*   OSM found that these documents, in

combination with the proposed decision and findings of CDRMS, "accurately assesse[d] the

environmental impacts of mining."   *Id.*   The agency then concluded that "[a]ll of the effects of

mining Federal leases C-0123476, C-29225, and C-29226 will be mitigated during the mining

operations or upon reclamation of the land at the conclusion of mining."   *Id.* at 16.   Based on its

analysis, OSM found that there would be no significant impact resulting from the expansion of

the Colowyo Mine.   This determination resulted in the issuance of a FONSI.   *Id.* at 12.

     The Trapper EA also relied on a number of previously prepared documents, with dates

ranging from 1974 to 1988.[12]   TRAPPER 683.   OSM found that these "previously prepared

environmental documents identify and discuss the environmental impacts of leasing and mining

the coal resources in Federal leases C-07519 and C-079641," though once again no citations are

---

[10] The EAs listed are as follows: BLM, *Taylor Creek Study Site: Axial Basin Coal Field Resource and Potential Reclamation*, 1975; BLM, *Northwest Colorado Coal Environmental Statement*, 1977; BLM, *Northwest Supplemental Report*, 1979; OSM, *Environmental Assessment, Proposed Increase in Production of the Colowyo Mine*, August 1980; OSM, *Environmental Assessment, Colowyo Mine, Mine Plan Approval*, February 1989; OSM, *Environmental Assessment, Colowyo Mine, Federal Lease C-29224, Mining Plan Modification, Moffat County, Colorado*, July 1992; OSM, *Environmental Assessment, Colowyo Mine, Federal Leases C-29225 and C-29226, Mining Plan Modification, Moffat and Rio Blanco Counties, Colorado*, July 2001.   COLOWYO 15.

[11] To properly incorporate material into a NEPA document by reference, the agency must cite to pertinent page numbers or other relevant identifying information, as well as briefly describe its contents.   *See* 43 C.F.R. § 46.135(b); 40 C.F.R. § 1502.21.

[12] The EAs listed are as follows: U.S. Department of Agriculture – Rural Electrification Administration, *Yampa Project Final Environmental Assessment, USDA-REA-ES (ADM)-74-2-f*, July 1974; BLM, *Environmental Statement, Northwest Colorado Coal, (FES-77-1)*, January 1977; BLM, *Northwest Supplemental Report*, 1979; The OSM contracted, Karman Tempo, *Cumulative Hydrologic Assessment: Effects of Coal Mining on the Yampa River Basin, Moffat and Routt Counties, Colorado*, January 1982; OSM, *Environmental Assessment, Trapper Mining, Inc., Trapper Mine*, April 1983; OSM, *Environmental Assessment, Trapper Mine, Modified Mining Plan*, April 1988.   TRAPPER 683.

provided in support of this declaration.  *Id.* at 684.  OSM then found that these documents, in combination with the proposed decision and findings of CDRMS, "accurately assesse[d] the environmental impacts of mining."  *Id.*  The agency ultimately concluded that there would be no significant impact resulting from the expansion of the Trapper Mine.  *Id.* at 25.

When reviewing a FONSI, the Court "must determine whether the agency acted arbitrarily and capriciously in concluding that the proposed action 'will not have a significant effect on the human environment.'"  *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) (quoting *Mineta*, 302 F.3d at 1112 (quoting 40 C.F.R. § 1508.13)).  "NEPA requires that we review the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors."  *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002) (citing *Marsh*, 490 U.S. at 373–74).  Only once the Court is satisfied that the agency's exercise of discretion is truly informed must it defer to the agency.  *Marsh*, 490 U.S. at 374.

Guardians insists that OSM failed to take a hard look at the direct and indirect effects on air and water quality resulting from the expansion of the Colowyo and Trapper Mines before issuing its FONSIs.  OSM and the intervenor-defendants respond with a variety of arguments ranging from claiming that OSM had no obligation to analyze these effects to contending that OSM took a sufficiently hard look at them.  The Court addresses each argument in turn.

Procedural Arguments

First, OSM argues that its impact analyses were sufficient because its role is "simply to review mining plan approvals" issued by the state regulating body, here CDRMS.  OSM maintains that it may not "usurp the state's role as regulator of surface mining, reclamation, water quality, and air quality . . . ."  [ECF No. 56 at 19].  Usurping is one thing; rubber stamping

is another.  OSM cannot shirk its own NEPA obligations.  *See* 30 C.F.R. § 745.13(b); *see also*

*State of N.C. v. F.A.A.*, 957 F.2d 1125, 1129–30 (4th Cir. 1992) ("Section 102(2) of NEPA, 42

U.S.C. § 4332(2), directs all federal agencies to comply with the Act.  This provision precludes

an agency from avoiding the Act's requirements by simply relying on another agency's

conclusions about a federal action's impact on the environment.").  The federal-state cooperative

agreement between the State of Colorado and the Secretary of the Interior states that DOI "shall

concurrently carry out its responsibilities which cannot be delegated to the State under the MLA,

National Environmental Policy Act (NEPA), and other public laws . . . ."  30 C.F.R. § 906.30

Art. VI ¶ 8.

On a peripheral note, Colowyo argues that any conduct *regulated* under the Clean Air

Next, OSM argues that any attempt to regulate air quality would be outside of its limited

power to regulate surface mining and reclamation.  OSM mischaracterizes the plaintiff's

challenge.  Guardians does not contend that OSM can regulate air quality.  Instead, it maintains

that OSM must take sufficient steps and conduct adequate analyses to determine whether a

proposed action taken pursuant to SMCRA will have a significant effect on the human

environment, including the surrounding air and water.

On a peripheral note, Colowyo argues that any conduct *regulated* under the Clean Air

Act is exempt from NEPA analysis.  Colowyo is incorrect.  The exemption states: "No action

*taken* under the Clean Air Act shall be deemed a major Federal action significantly affecting the

quality of the human environment within the meaning of the National Environmental Policy Act

of 1969."  15 U.S.C. § 793(c)(1) (internal citations omitted) (emphasis added).  These actions are

exempt because the Clean Air Act already "serves the purpose of NEPA," for example by

requiring the EPA "to consider and balance the environmental impact, the costs, and the

alternatives; to give opportunity for public comment; and to publish the results of the

23

decisionmaking" when promulgating air quality standards. *Pac. Legal Found. v. Andrus*, 657 F.2d 829, 834 (6th Cir. 1981). However, the Colowyo and Trapper FONSIs were issued pursuant to SMCRA, not the Clean Air Act, even though they remain regulated under the latter.

The question posed by the plaintiff is not whether the increased mining will result in a release of particulate matter and ozone precursors in excess of the NAAQS, but whether the increased emissions will have a significant impact on the environment. One can imagine a situation, for example, where the particulate and ozone emissions from each coal mine in a geographic area complied with Clean Air Act standards but, collectively, they significantly impacted the environment. It is the duty of OSM to determine whether a mining plan modification would contribute to such an effect, whether or not the mine is otherwise in compliance with the Clean Air Act's emissions standards. During oral argument, even OSM's counsel acknowledged that he does not read the Clean Air Act exemption to mean that OSM cannot or need not assess the impacts of mining activities on air quality.

<u>Substantive Arguments</u>

*Direct Effects*

In the alternative, OSM argues that it took a sufficiently hard look at the **direct** adverse air impacts before issuing the FONSIs. Direct effects are effects that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). In particular, OSM maintains that it adequately and properly relied on previously compiled environmental documents that "did in fact address impacts of both fugitive dust (also referred to as 'total suspended particulates' or 'particulate matter') from surface mining operations in the region, as well as emissions of nitrogen oxides, an essential element in ozone formation," citing TRAPPER 1691–1715 and

COLOWYO 3228–3251 in support.  [ECF NO. 56 at 20].  These citations are made to the same

pages in the same report, BLM's *Northwest Supplemental Report* from 1979.

Upon reviewing the report, the Court finds that OSM did not adequately or properly rely

on its contents, which are considerably outdated.  The report states that it provides a "regional

cumulative analysis of federal coal development that may occur in northwest Colorado through

1990."  TRAPPER 1443;[13] *see also id.* at 1691 ("The impacts on the ambient concentrations of

total suspended particulates (TSP), sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), carbon

monoxide (CO) and non-methane hydrocarbons (NMHC) are examined for 1980, 1985, and

1990.").  Meanwhile, the mining plan modifications in this case were filed in 2007 and 2009.

Furthermore, these pollutant concentrations were compared to the ambient air quality standards

from 1979.  *Id.*  No one disputes that the standards have become more stringent since that time.

And yet there appears to have been no analysis by OSM of the pollutant concentrations with

respect to the current air quality standards, even assuming the 1990 emissions projections were

sufficiently relied upon.

OSM is responsible for supplementing reports when there have been "significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impacts."  40 C.F.R. § 1502.9(c)(ii).  Trapper argues that because the impacts of

mining are not new, the change in air quality standards does not demand that OSM conduct

additional analysis with respect to direct effects on air quality.  The Court disagrees.  First,

although the defendant parties do not acknowledge that the report itself is outdated, it was never

intended to assess or predict pollutant concentrations past 1990.  Second, a change in air quality

emissions standards would, at a minimum, require OSM to consider how the new standards

---

[13] For ease of reference the Court will refer solely to the report in the Trapper administrative record.

impact its analysis of whether a proposed action "significantly" affects the quality of the human environment.  More stringent standards would arguably make the same action more significant.

Finally, Colowyo argues that because the state issued an air quality permit, any air quality assessment performed by OSM would be duplicative.  But under NEPA, federal agencies must take a hard look at the environmental impacts of a proposed action even if the action is compliant with other laws and regulations.  *See S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009).

*Indirect Effects*

Next, the plaintiff argues that OSM did not consider the impacts of coal combustion as an **indirect** effect on air and water quality.  Indirect effects are effects that "are caused by the action and are later in time or farther removed in distance [than direct impacts], but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  "Indirect effects may include . . . effects on air and water and other natural systems, including ecosystems."  *Id.*  OSM insists that NEPA does not require an analysis of the indirect impacts of coal combustion in this set of circumstances.  Trapper takes this argument one step further and maintains that OSM had no authority to take into account these indirect effects.[14]  Going beyond both, Colowyo contends that coal combustion is not an actual "effect" of the mining plan within the meaning of NEPA because a mining plan does not *cause* coal combustion.

Beginning with Colowyo's claim, it argues that there is a fundamental difference between approving a lease bid, which would cause the combustion of coal, and approving a mining plan, which simply specifies how the coal will be extracted.  According to Colowyo, coal lessees have

---

[14] Trapper adds that OSM lacks the authority to regulate indirect adverse air quality from coal combustion.  However, the plaintiff does not argue that OSM has any regulatory authority in this arena.  As discussed earlier, the challenge concerns OSM's failure to take a hard look at the direct and indirect effects on air and water quality before making findings of no significant impact and recommending approval of the mining plan modifications.

a duty diligently to mine commercial quantities of leased coal.  *See* 30 U.S.C. § 207(a) (setting

term of federal coal lease for twenty years while adding that "[a]ny lease which is not producing

[coal] in commercial quantities at the end of ten years shall be terminated"); 30 U.S.C. §

207(b)(1) (requiring that each lease be subject to the conditions of diligent development and

continued operation of the mine).  Mining plans, on the other hand, simply operationalize the

lease.  Yet this case is not about mining plans that operationalize a lease.  It is about permit

renewal applications that became mining plan *modifications* on account of their proposal to

expand mining to previously untouched federal lands.  As SMCRA makes clear, any proposed

expansion of mining operations beyond the boundaries authorized by an existing permit "shall be

subject to the full standards applicable to new applications" for mining leases.  30 U.S.C. §

1256(d)(2).[15]  The approval of these mining plan modifications has increased the area of federal

land on which mining has occurred and has, in turn, led to an increase in the amount of federal

coal available for combustion.  Coal combustion is therefore an indirect effect of the approval of

the mining plan modifications.[16]

Next, OSM argues that NEPA does not require an analysis of the impacts of coal

combustion because its "statutory role in this case is limited to the narrow task of approving

mining plans developed by the state in an exercise of its primary jurisdiction."  [ECF No. 56 at

23].  According to OSM, it "simply has no authority to include restrictions in its approval

---

[15] During oral argument, counsel for Trapper stated for the first time that Trapper's mining plan modification did not expand or increase the previously permitted mine boundaries set by Colorado.  No evidence was submitted to supplement the record with respect to this claim, nor did counsel explain how this discrepancy impacted his client's case.  As discussed earlier, OSM only becomes involved in the permit modification process if a company proposes to expand its mining operations onto previously un-mined federal lands containing federal coal.  According to OSM, Trapper did just that.  If Trapper disagreed, the appropriate time to have raised this defense would have been in a motion to dismiss or, at the latest, in the original set of briefing.

[16] Trapper's argument is made in the same vein and fails for the same reason.

decisions directing how, when, at what rate, or under what technology coal would be burned." *Id.* While OSM is not required to consider the effects of an action that it "has no ability to prevent," *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004), the plaintiff is not demanding that OSM regulate the combustion of the coal. Instead, it rightly insists that OSM must take into account the effects of such combustion when determining whether there will be a significant impact on the environment, a necessary step before taking any action on a mining plan.

Furthermore, the Court is not persuaded by OSM's attempt to distinguish this case from those in which the approval of a mining plan leads to an increase in the market share of coal. The Court understands that the coal mined under these two lease modifications is mined solely for use by the Craig Power Plant. But just because the coal is not entering the free marketplace does not mean that its combustion is not reasonably foreseeable. Quite the opposite, in fact. The interdependence between the mines and the Craig Power Plant effectively guarantees the foreseeability of combustion-related effects. As Judge Kane recently explained,

> Unlike a scenario in which a coal mine markets its coal freely to multiple buyers, each of whom uses that coal in different applications under different constraints, there is virtually no uncertainty regarding when, where, and how the coal mined as a result of NTEC's proposed mine expansion will be combusted. All of the coal mined from Area IV North will be combusted at the Four Corners Power Plant. Because there is no uncertainty as to the location, the method, or the timing of this combustion, it is possible to predict with certainty the combustion-related environmental impacts.

*Diné Citizens Against Ruining Our Env't v. United States Office of Surface Mining Reclamation & Enforcement*, --- F. Supp. 3d. ----, No. CV 12-CV-01275-JLK, 2015 WL 996605, at *6 (D. Colo. Mar. 2, 2015) (internal citations and footnote omitted). In this case, even if the timing of combustion is unknown, its location and method are not. Furthermore, the timing can be predicted, in part, by analyzing the historic rate of combustion.

28

Finally, the defendants argue that OSM could not take into account the effects of coal

combustion because it is purely speculative when the coal will be burned, at what rate it will be

used, and what emissions-control technology might be applied at the combustion stage.  The

Court is not convinced.  Agencies need not have perfect foresight when considering indirect

effects, effects which by definition are later in time or farther removed in distance than direct

ones.  "[W]hen the *nature* of the effect is reasonably foreseeable but its *extent* is not . . . the

agency may not simply ignore the effect."  *Mid States Coal. for Progress v. Surface Transp. Bd.*,

345 F.3d 520, 549 (8th Cir. 2003) (emphasis in original).

In a recent case, I found that insofar as a federal agency was able to estimate the amount

of coal to be mined it could likewise predict the environmental effects of the combustion of that

coal.  *See High Country*, 52 F. Supp. 3d. at 1196.  I stand by that holding.  Both the Colowyo and

Trapper EAs estimate the increase in coal production resulting from the proposed lease

expansions on each mine.  *See* COLOWYO 13; TRAPPER 682.  If OSM can predict how much

coal will be produced, it can likewise attempt to predict the environmental effects of its

combustion.  Just because it does not possess perfect foresight as to the timing or rate of

combustion or as to the state of future emissions technology does not mean that it can ignore the

effects completely.[17]

### F.  Remedies.

Federal law typically directs this Court to hold unlawful and to set aside agency action

found to be arbitrary, capricious, or otherwise not in accordance with the law.  5 U.S.C. §

---

[17] The defendants misread *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D. C. Cir. 2013) ("*West Antelope II*"), insofar as they believe that it says otherwise.  The *West Antelope II* court never found that BLM was excused from considering the effects of coal combustion because they were too speculative.  In fact, BLM had projected the increase in greenhouse gas emissions resulting from coal combustion – an analysis OSM did not attempt in either the Trapper or Colowyo EAs – and the effects of those emissions on global climate change.  The court refused to fault BLM, however, for explaining that its projections were speculative.  738 F.3d at 309.

706(2)(A).  Nonetheless, the APA preserves the power of the courts to fashion an alternative

remedy on other equitable or legal grounds.  5 U.S.C. § 702.  "Nothing in the Administrative

Procedure Act . . . restricts the range of equitable remedies available to the Court, including the

issuance of declaratory relief without setting aside the agency action." *Pac. Rivers Council v.*

*U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1018 (E.D. Cal. 2013) (citing 5 U.S.C. § 702; 5 U.S.C.

§ 703).  "Whether agency action should be vacated depends on how serious the agency's errors

are 'and the disruptive consequences of an interim change that may itself be changed.'"

*California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012)

(quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.

Cir.1993)).

      The Court concludes that the following remedies are necessary and sufficient in the

circumstances of this case:

      1.  The Court declares that OSM violated NEPA by failing to notify the public of and

involve the public in the preparation of the Colowyo and Trapper EAs and by failing to notify

the public once the EAs had been completed and the FONSIs had been issued.  OSM also

violated NEPA by failing to take a hard look at the direct and indirect effects of the increased

mining operations before determining that there would be no significant impact on the

environment.  The Secretary of the Interior violated NEPA by approving both of these mining

plan modifications in spite of these defects.

      2.  With respect to the Trapper mining permit revision, vacatur makes no sense.  The

federal coal covered by the revision has been mined.  Whatever federal coal remains will not be

mined before a new permit revision is approved.

3.   With respect to the Colowyo mining permit revision, vacatur is still timely given that approximately 12 million tons of coal remain to be mined at the revision site.   However, the Court is aware that, according the Declaration of Juan Garcia, Technical Services Manager for the Colowyo mine, the mine employs nearly 250 people at full production.   Garcia Decl. [ECF No. 59-3] ¶ 4.   He represents that invalidation of the 2007 mine plan revision would likely cause layoffs if the operations were halted for any significant period, as well as "serious economic losses" to Colowyo.   *Id.* ¶¶ 14, 15.   It might also pose a hardship to the power plant which depends on Colowyo as a principal source of coal.   This is not to say that the Court would not order vacatur despite the individual hardships that would follow in an appropriate case.   *See, e.g.*, *Dine Citizens Against Ruining Our Environment*, No. 12-cv-1275-JFK, 2015 WL 1593995, at *2-3 (D. Colo. April 6, 2015); *High Country Conservation Advocates v. United States Forest Serv.*, --- F. Supp. 3d ----, No. 13-CV-01723-RBJ, 2014 WL 4470427, at *4 (D. Colo. Sept. 11, 2014).   However, given the fact that mining in this area has occurred since the mid-1970's; that the environmental impacts have been studied over the years; that the state agency considered the environmental impacts from these mining plan revisions; and that government counsel noted during the hearing that OSM has changed its notice practices and procedures, I find that the benefits of immediate vacatur do not outweigh the potential harms.

4.   Instead, the Court will defer entering a vacatur order for a period of 120 days from the date of this order.   During that period the Court expects OSM to take a hard look at the direct and indirect environmental effects of the Colowyo mining plan revision, and to provide public notice and an opportunity for public involvement before reaching its decisions.   If this process has not been completed within the 120-day window, then an order of vacatur will be immediately effective absent further court order based upon very good cause shown.

     5.   The Court awards the plaintiff its <u>reasonable</u> attorney's fees and other expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412, as the Court finds that the position of the United States was not substantially justified and no special circumstances make the award unjust. 28 U.S.C. § 2412(d)(1)(A).  The Court directs the parties to confer and attempt in good faith to reach an agreement to determine an amount.  If agreement is not reached, the parties may set an evidentiary hearing on the amount.

     DATED this 8th day of May, 2015.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-00518-RBJ

WILDEARTH GUARDIANS,

     Plaintiff,

v.

UNITED STATES OFFICE OF SURFACE MINING, RECLAMATION AND
ENFORCEMENT,
AL KLEIN, in his official capacity as Western Regional Director of the Office of Surface
Mining, Reclamation and Enforcement, Denver, Colorado, and
S.M.R. JEWELL, in her official capacity as U.S. Secretary of the Interior,

     Defendants,

COLOWYO COAL CO. L.P., and
TRAPPER MINING, INC.,

     Intervenor-Defendants.

---

## FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to the ORDER, Document No. 78 of Judge R. Brooke Jackson entered

on May 8, 2015, it is

ORDERED that judgment is entered in favor of the plaintiff, WILDEARTH

GUARDIANS, and against the defendants and intervenor-defendants, UNITED STATES

OFFICE OF SURFACE MINING, RECLAMATION AND ENFORCEMENT, AL KLEIN,

S.M.R. JEWELL, COLOWYO COAL CO. L.P. and TRAPPER MINING, INC. .  It is

FURTHER ORDERED that the Court enters a declaratory judgment that the

Office of Surface Mining, Reclamation and Enforcement violated the National

Environmental Policy Act by failing to notify of and involve the public in the preparation

of the Colowyo and Trapper Environmental Assessments and by failing to notify the

public once the Environmental Assessments had been completed and the Finding of No

Significant Impact had been issued.  The Office of Surface Mining, Reclamation and

Enforcement also violated the National Environmental Policy Act by failing to take a

hard look at the direct and indirect effects of the increase mining operations before

determining that there would be no significant impact on the environment. It is

FURTHER ORDERED that the Court enters a declaratory judgment that the

Secretary of the Interior violated the National Environmental Policy Act by approving the

Colowyo and Trapper mining plan revisions at issue in this case in spite of the failure of

the Office of Surface Mining, Reclamation and Enforcement to comply with its

obligations under the National Environmental Policy Act.  It is

FURTHER ORDERED that the Office of Surface Mining, Reclamation and

Enforcement is directed to take a hard look at the direct and indirect environmental

effects of the Colowyo mining plan revision and to provide public notice and an

opportunity for public involvement in compliance with the National Environmental Policy

Act.  It is

FURTHER ORDERED that the Court will not enter an order of vacatur as to the

approval of the mining plan revision for the Trapper Mining, Inc. mine. It is

FURTHER ORDERED that the Court will not, at this time, enter an order of

vacatur as to the approval of the mining plan revision for the Colowyo Coal Co., L.P.

mine.  However, the Court will enter an order of vacatur, vacating the Secretary of the

Interior's approval of the Colowyo mining plan revision, in 120 days unless the Office of

Surface Mining, Reclamation and Enforcement has fully completed its obligations under

the National Environmental Policy Act, absent further court order based upon very good

cause shown.  It is

FURTHER ORDERED that WildEarth Guardians is awarded its reasonable

attorney's fees and other expenses against the Office of Surface Mining, Reclamation

and Enforcement and the Secretary of the Department of the Interior (in her official

capacity) under the Equal Access to Justice Act, 28 U.S.C. section 2412, based upon

the Court's finding that the position of these defendants was not substantially justified,

and that no circumstances make the award unjust.  The parties are directed to confer

and attempt in good faith to reach an agreement as to the amount.  If agreement is not

reached, the parties may set an evidentiary hearing on the amount.

Dated at Denver, Colorado this 8th day of May, 2015.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By:  s/   J. DYNES
_____

J. DYNES
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-00518-RBJ

WILDEARTH GUARDIANS,

      Plaintiff-Appellee,

v.

UNITED STATES OFFICE OF SURFACE
MINING RECLAMATION AND ENFORCEMENT,
AL KLEIN, in his official capacity as Western Regional
Director of the Office of Surface Mining, Reclamation
and Enforcement, Denver Colorado, and
S.M.R. JEWELL, in her official capacity
as U.S. Secretary of the Interior,

      Federal Defendants-Appellant

COLOWYO COAL CO. L.P. and TRAPPER MINING, INC.,

      Defendant-Intervenors-Appellant.

---

**NOTICE OF APPEAL**

---

      Notice is hereby given that Colowyo Coal Co. L.P., Defendant-Intervenor in the above

named case, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the

District Court's May 8, 2015, Order (ECF No. 78) and Judgment (ECF No. 79) declaring

violations of the National Environmental Policy Act (NEPA) and ordering remedies thereto.

      Respectfully submitted this 29th day of May, 2015.

            DORSEY & WHITNEY LLP


            s/Stephen D. Bell
            Stephen D. Bell
            Scott P. Sinor

1400 Wewatta Street, Suite 400
Denver, CO 80202-
Telephone:  (303) 629-3400
Facsimile:  (303) 629-3450
E-mail:  bell.steve@dorsey.com
          sinor.scott@dorsey.com


Michael R. Drysdale
Dorsey & Whitney LLP
50 South Sixth Street
Minneapolis, MN 55402
Telephone (612) 340-5652
Facsimile: (612) 340-2868
E-mail: drysdale.michael@dorsey.com

ATTORNEYS FOR
COLOWYO COAL COMPANY, L.P.

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on May 29, 2015 I caused the forgoing document titled **NOTICE OF APPEAL** to be electronically filed with the Clerk of the Court using the CM/ECF system.  Notification of such filing will be sent to the following email addresses:

**James Jay Touchtone**
**Ashley Dye Wiles**
**Samantha M. Ruscavage−Barz**
WildEarth Guardians−Denver
Email: jtutchton@wildearthguardians.org
Email: awilmes@wildearthguardians.org
Email: sruscavagebarz@wildearthguardians.org
**Attorneys for WildEarth Guardians**


John S. Most
U.S. Department of Justice-DC-7611
Email: john.most@usdoj.com
**Attorneys for Defendants**
**Kristina R. Van Bockern**
**Paul Martin Seby**
Holland &Hart, LLP−Denver
Email: trvanbockern@hollandhart.com
Email: pmseby@hollandhart.com

**Attorneys for Trapper Mining Inc.**


                           s/ Karen Porter
                           Karen Porter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-00518-RBJ

WILDEARTH GUARDIANS,

  Plaintiff,

v.

U.S. OFFICE OF SURFACE MINING
RECLAMATION AND ENFORCEMENT,
ERVIN BARCHENGER, Acting Western
Regional Director of the Office of Surface Mining
Reclamation and Enforcement, Denver, Colorado,
and SALLY JEWELL, in her official capacity as
U.S. Secretary of the Interior,

  Defendants,

COLOWYO COAL CO. L.P., and TRAPPER
MINING, INC.,

    Defendant-Intervenors

---

### COLOWYO COAL COMPANY'S MOTION FOR STAY PENDING APPEAL

---

### INTRODUCTION

      Intervenor-Defendant Colowyo Coal Co. L.P., ("Colowyo") respectfully moves the Court

for a stay pending appeal of its Order, Dkt. 78, -- F.Supp.2d. ----, 2015 WL 2207834 (D. Colo.

May 8, 2015)("Order"), and Judgment, Dkt. 79, ("Judgment").  The Order and Judgment err as

to the scope of the discretion held by Defendant Office of Surface Mining Reclamation and

Enforcement ("OSM") under the Surface Mining Control and Reclamation Act ("SMCRA") and

Clean Air Act ("CAA"), and OSM's corresponding duties to analyze the indirect and direct

effects under NEPA of a proposed modification to a Mine Plan of Operation, issued in 2007.

The Court also improperly restricts OSM's discretion regarding public involvement in NEPA

proceedings under applicable law, and failed to correctly apply the equitable doctrine of laches.

These errors cause a significant threat of irreparable harm to Colowyo, and both the balance of

harms and public interest favor issuance of a stay.

## STANDARD OF REVIEW

A stay pending appeal is an exercise of judicial discretion, and "the propriety of its issue

is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433

(2009).  When reviewing a stay motion, the Courts of Appeal consider:

> (1) whether the stay applicant has made a strong showing that he is
> likely to succeed on the merits; (2) whether the applicant will be
> irreparably injured absent a stay; (3) whether issuance of the stay will
> substantially injure the other parties interested in the proceeding; and (4)
> where the public interest lies.

*Id*. at 434 (internal quotation marks omitted).  The party requesting the stay bears the burden to

establish a stay is warranted.  *Id.* at 433-34.

In the district court, the "test for obtaining a stay pending appeal is the same as that for an

injunction in this circuit." *Desktop Images, Inc. v. Ames*, 930 F. Supp. 1450, 1451 (D. Colo.

1996).  The court further explained, "[i]n the granting or denial of injunctions this court has

ruled, consistent with the cited opinion, that the true test is whether the movant has made a

substantial case on the merits.  In other words, has the movant presented a serious and substantial

legal question." *Id.* at 1452.

## EVENTS SINCE ISSUANCE OF THE ORDER AND JUDGMENT

The Order and Judgment have received significant media and public attention.  The

prospect of the potential shutdown of the Colowyo Coal Mine in early September has prompted

significant concern and distress among mine employees, Rio Blanco and Moffat Counties where

the Mine is located, and Craig, Colorado, where many mine employees live and where the Mine

is a significant contributor to the local economy.  Declaration of Chris McCourt ("McCourt

Decl.") ¶¶ 3-4.  These concerns have been heightened by WildEarth Guardians ("Guardians")

post-judgment commentary, which highlighted the potential for shutdown and the need to

"embrace" the transition away from coal.[1]  Employees and area residents have approached

Colowyo to inquire whether they should begin the process of selling their homes, and have

delayed major purchases that would tie them to the community.  McCourt Decl. ¶ 3.

OSM has been working expeditiously to meet the Court's deadline.  On May 21, 2015,

OSM published a notice in local newspapers announcing a public meeting on the remedial NEPA

process on June 10, 2015, and an opportunity to comment through June 15, 2015.[2]  An additional

notice will be published on June 4, 2015.  *Id.*  Notice has also been provided on OSM's website.[3]

Upon the closure of the public comment period, OSM will have 82 days to consider the

comments, prepare the supplemental analysis, provide public notice of the analysis, and reach a

decision.  Order at *16.

Colowyo has dedicated significant resources to providing any additional information

OSM might require to prepare the remedial NEPA analysis.  McCourt Decl. ¶ 2.  When

---

[1] http://www.coloradoindependent.com/153315/environmentalists-are-targeting-colorado-coal-successfully (last visited May 29, 2015).
[2] http://www.theheraldtimes.com/classifieds-may-21-2015/rio-blanco-county/ (last visited May 28, 2015).
[3] http://www.wrcc.osmre.gov/initiatives/colowyoMineSouthTaylor.shtm (last visited May 29, 2015).

approached by members of the public or employees, however, Colowyo has refrained from making any predictions regarding OSM's ability to meet the 120 day deadline for an analysis or decision, or as to OSM's likelihood of prevailing on any challenge to the process or decision.  *Id.* ¶ 4.  This is informed in part by the fact that no coal combustion analysis of the type ordered by the Court has to date been reviewed or upheld by the district court for the District of Colorado. Moreover, despite the paucity of Guardians' arguments to date on the substantive adequacy of the mine plan in the litigation, Guardians is typically not restrained in its NEPA scoping commentary.  For example, on May 22, 2015, Guardians submitted scoping commentary on the supplemental NEPA analysis ordered by the Court in the *High Country Conservation Advocates* litigation.  Guardians' comments totaled 87 single-spaced pages, and contended that not only must the Forest Service conduct the climate change analysis ordered by the Court, but that the Forest Service must essentially re-do the entire environmental impact statement for the Colorado Roadless Rule on all subjects pertaining to the North Fork Valley Exception.[4]  None of this is to suggest Guardians lacks the right to demand such extensive re-analysis, but the scope of the Order, the likely range and depth of commentary, and the deadline imposed by the Court all combine to make the summer of 2015 one of great trepidation for that part of Northwestern Colorado.  McCourt Decl. ¶¶ 3-4.  In that context, the safety valve of a potential extension for "very good cause shown" provides little comfort.

## ARGUMENT

### A.    Colowyo has High Likelihood of Success on Appeal

---

[4] http://www.wildearthguardians.org/site/DocServer/Comments_of_HCCA_et_al_on_scoping_-_Colorado_Roadless_Ru.pdf?docID=16122 (last visited May 28, 2015).

Many of the issues litigated and determined by the Court in its Order, including standing and waiver, were thoroughly addressed in the briefing on the merits and need not be reiterated in detail in this Motion.  Colowyo instead focuses on those issues for which the Order supplies additional or variants of interpretations and arguments raised on the merits, for which additional discussion will illuminate Colowyo's likelihood of success on appeal.  There are five such issues: (1) the interpretation of SMCRA, (2) the analysis of but-for causation of coal combustion effects, (3) the inclusion of compliance with National Ambient Air Quality Standards ("NAAQS") in OSM's remedial NEPA analysis, (4) the Court's directives to OSM regarding public participation in the remedial NEPA process, and (5) the Court's application of the laches doctrine.  The serious questions regarding standing and waiver are also briefly discussed.

**(1)      The Court Misinterpreted SMCRA and OSM's Duties Under the Cooperative Agreement with Colorado, Resulting in an Error in the Court's Determination of OSM'S NEPA Duties**

Colowyo contended that OSM's Mine Plan of Operation review obligations were constrained by the terms of the previously issued and unchallenged federal coal leases awarded to Colowyo.   Specifically, combustion of the mined coal is a necessary and foreseeable consequence of granting a federal coal lease.  After the Department of the Interior granted a lease to Colowyo, in exchange for bonus bid payments, OSM was obligated to approve a Mine Plan of Operations revision only if the plan would achieve the maximum economic recovery of coal within the lease tract. 30 U.S.C. § 201(a)(3)(c).  Colowyo contended that OSM by law cannot

condition a plan of operation or permit based upon the effects of coal combustion, and therefore

OSM has no duty to analyze combustion effects.  *DOT v. Public Citizen,* 541 U.S. 752 (2004).[5]

  The Court disagreed, acknowledging that *Public Citizen* limits an agency's NEPA duties,

but concluding that OSM does have the discretion to condition a permit based on coal

combustion effects, pursuant to SMCRA.  Specifically, the Court stated on two occasions:

> The portion of the modified plan addressing new land areas is subject to the full standards applicable to new applications for mining *leases* under SMCRA.  30 U.S.C. § 1256(d)(2)
>
> . . .
>
> As SMCRA makes clear, any proposed expansion of mining operations beyond the boundaries authorized by an existing permit "shall be subject to the full standards applicable to new applications" for mining *leases*. 30 U.S.C. § 1256(d)(2).

Order at *2, *14 (emphases added).  In the Court's view, because the standards applicable to

leases and permit revisions are identical, OSM has the discretion to condition a permit on the

basis of coal combustion effects, and the examination of such effects is fully within the scope of

OSM's NEPA obligations.  *Id.*

  The Court misreads SMCRA.  Section 1256(d)(2) does not say or refer to "leases," but

only to "*applications under this chapter.*" (emphasis added).  Lease applications are not filed or

reviewed under SMCRA Chapter 25 (30 U.S.C. §§ 1251-79).  Leases are reviewed and issued

---

[5] The same principle applies to any analysis of effects to threatened and endangered ("T&E") species arising from coal combustion. OSM has no obligation to analyze the effects of combustion on T&E species, because it is statutorily commanded to maximize economic recovery of the leased coal and has no authority to restrict the supply of coal to the Craig Station or any other facility.  *National Ass'n v. Defenders of Wildlife*, 127 S. Ct. 2518, 2532-35 (2007); s*ee also* 50 CFR 402.03 ("Section 7 and the requirements of this part apply to all actions in which there is *discretionary* Federal involvement or control"). (emphasis added).

under the Mineral Leasing Act, 30 U.S.C. §§ 201-207 ("MLA").  It is clear that the phrase

"applications under this chapter" refers to *permit applications*, not lease applications, especially

since the focus of Section 1256(d)(2) is to ensure that expansion of permit boundaries are to be

examined as if they were a new permit application, rather than under a permit renewal as of

right.  *Id.*  Instead, SMCRA review of permit applications is always conducted *post-leasing*, and

is constrained by the rights and obligations conferred by the lease.  This includes the right to

mine the leased coal. The Court therefore errs in conflating SMCRA review of permit

applications with MLA review of lease applications.

Moreover, the Court adopted an overly expansive view of OSM's rights under SMCRA,

holding that OSM has essentially plenary authority to review and modify state-issued SMCRA

permits pursuant to OSM's reserved authority to oversee state implementation of the SMCRA

*program*.  Order at *2.  But authority to monitor implementation of the program does not imply

authority to second guess individual permit decisions.  This is made clear in the preamble to the

1983 amendments to the rules for surface coal mining and reclamation operations on Federal

lands (intended to "more clearly delineate the roles of the Federal government and the States").

> Where a cooperative agreement is in place, the permit application package will be
> submitted to OSM and the State.  The State will then assume the lead role in the
> review of the package, which (at the State's option) may or may not include
> ensuring consultation with involved Federal agencies, including OSM.  Where the
> State has elected not to coordinate the required consultation among Federal
> agencies, OSM would ensure that affected Federal agencies were consulted and
> necessary comments or concurrences received.  *In particular, the State will be
> responsible for review and approval of the SMCRA permit application.  OSM will
> continue to be responsible for ensuring compliance with other applicable Federal
> laws, regulations and orders not otherwise covered under the SMCRA review*. . . .

48 Fed. Reg. 6912, 6914 (Feb. 16, 1983) (emphasis added); *see also id*. at 6915 ("OSM will

receive copies of permit application packages, which include permit applications, not to review

the applications for compliance with SMCRA, *but to facilitate OSM's role in compliance with applicable laws not otherwise covered in the SMCRA review. The State will have the <u>sole responsibility</u> for reviewing permit applications for SMCRA compliance*." (emphasis added)). *See also In Re Permanent Surface Mining Litigation,* 653 F.2d. 514, 517-520 (D.C. Cir. 1981).[6]

Notably, the Department of the Interior is obligated to consider the reasonably foreseeable environmental consequences of leasing and mining during the *leasing* process. 30 U.S.C. § 201(c); 30 U.S.C. § 1273. And to the extent that the environmental effects of a mine are *not* reasonably foreseeable at the time of leasing because more detail regarding the local area and the mine plan need to be developed, these facts can certainly constrain mine plan and permit review and approval. But the *most* foreseeable aspect of an application to lease coal is that the coal, if leased, will be burned, as the Court has previously recognized. Order at *10; *High Country Conservation Advocates v. United States Forest Serv.,* 52 F.Supp.3d 1174, 1194 (D. Colo. 2014). Once the Department of the Interior has issued a lease, which is a binding contract with the lessee, OSM does not have the right to impair that lease based upon consequences of leasing that were completely foreseeable at the time of lease issuance. Studying the consequences of combustion in a NEPA document is not useful to the decision maker at the mining plan approval stage and cannot enhance the quality of decision making because there is no condition that OSM could impose on the mining operation that would affect the combustion.

---

[6]     Part of the confusion over OSM's role may arise from the discussion in *Diné Citizens Against Ruining Our Env't v. United States Office of Surface Mining Reclamation & Enforcement*, ⎯⎯ F.Supp.3d. ⎯⎯, No. CV 12–CV–01275–JLK, 2015 WL 99660, decided and submitted after merits briefing was complete. *Diné Citizens* is inapposite on the subject of OSM's rights and duties in the context of Mine Plan of Operations review where there is a state-approved program. On tribal lands, OSM functions as the primary SMCRA permitting authority.

For these reasons, the Secretary has no authority or discretion to condition Colowyo's permit on the basis of combustion effects, and no duty to analyze such effects under *Public Citizen*. The Court's misinterpretations of SMCRA[7] results in an error in the Court's holding regarding OSM's NEPA duties.

### (2)   The Court Neglected the Element of But-For Causation in Interpreting OSM's Duty to Analyze Coal Combustion Effects

In addition to its misinterpretation of SMCRA, the Court misapplies the test for causation as related to OSM's duty to analyze combustion effects. The Court relies heavily on *Diné Citizens,* 2015 WL 996605, at *6, for its determination that coal combustion is a reasonably foreseeable indirect effect of OSM's mine plan review, and therefore within the range of consequences OSM must analyze under NEPA. Order at *14-15. However, the Court only applies one prong of the two-prong test recognized in *Diné Citizens.* As explained in *Diné Citizens*:

> Accordingly, *Petitioners must demonstrate both* that (1) "but for" the proposed expansion, the coal combustion-related impacts would not occur and (2) the coal combustion-related impacts are reasonably foreseeable.

*Id.* *6. (emphasis added).   The Court concludes that because Colowyo's coal is intended for the Craig Station, the destination and quantities of coal to be burned are sufficiently known to be reasonably foreseeable. Order at *15. But the Court never acknowledges, much less analyzes, whether Guardians carried its burden to show but-for causation. As pointed out during oral

---

7      Colowyo takes no position on the potentially similar issue in *Diné Citizens*, in which the Court also held that OSM has broad discretion to condition a mining permit on coal combustion effects.   Again, the coal at issue in that litigation is *tribal coal*, which implicates a variety of statutory provisions and doctrines that are distinct from the rights conferred by a federal coal lease competitively issued under the MLA.

argument and not contradicted anywhere in the Administrative Record, the Craig Station is

unlike the Four Corners Power Plant at issue in *Diné Citizens* in that it has the ability to receive

coal from other coal mines.  *See Diné Citizens* at *6 (petitioners established that "it is not

economically feasible for the Four Corners Power Plant to secure coal from any other source").

Because Guardians failed to carry their burden to show that a reduction in coal sent from

Colowyo will translate into any effect on net combustion at Craig Station, they have failed to

show but-for causation, and their Petition as to the failure to consider coal combustion related

environmental effects should have been dismissed.

**(3)     The Court Improperly Directed OSM to Analyze the Effect of the Mine Plan
          Modification on Compliance with NAAQS**

Colowyo had contended that Guardians' allegations that OSM had failed to adequately

analyze direct air quality effects, specifically related to compliance with PM 2.5 and ozone

NAAQS standards, must fail as a matter of law, because compliance with such standards is

regulated under permits contemporaneously issued by the Colorado Department of Public Health

and the Environment under the CAA for the coal at issue, and actions taken under the CAA are

exempt from NEPA review.  The Court disagreed, observing that NEPA has a broader focus, and

the Court could imagine circumstances in which NEPA analysis would disclose and inform

decision makers about environmental effects not captured under the CAA permits. Order at *13.

This reasoning has logic as far as it goes, but it neither saves Guardians' Petition nor

justifies the scope of the Court's remedial directive to OSM.  As to the Petition and arguments in

briefing, the only direct air quality issues Guardians ever specifically identified was the failure to

analyze compliance with the PM 2.5 and Ozone NAAQS, even after over two years of litigation

to ruminate on the matter.  The fact that someone at some point might theoretically identify a

10

direct air quality effect of mining that is not encompassed by the Mine's CAA permit is not relevant to the sustainability of Guardians' Petition on this subject, which was limited to the NAAQS for PM 2.5 and Ozone.  Consequently, the Court should have dismissed the Petition on this subject.

Equally importantly, while the Court based its holding on the conclusion that NEPA encompasses more than the CAA, it did not limit its remedial NEPA directive to OSM to study those incremental effects.  Rather, the Court expressly directed OSM to examine the effect of the permit revision on NAAQS compliance and revisions in air quality standards, Order at *13, the very subject over which OSM has no discretion and which the CAA has exempted from NEPA. The Court's remedial directive is thus materially overbroad, and in error.

### (4) The Court Improperly Limited OSM's Discretion to Determine the Appropriate Degree of Public Involvement in NEPA Proceedings

Although the Judgment simply directs OSM to comply with NEPA in the remedial mine plan review, Dkt. 79, the Order is more specific.  The Order states:

> the Court expects OSM . . . to provide public notice and an opportunity for public involvement before reaching its decisions.

OSM at *16.  This directive appears to be driven by 40 C.F.R. § 1501.4(b), and the Ninth Circuit's gloss on the CEQ regulation, as stated in *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers,* 524 F.3d 938, 953 (9th Cir. 2008) and *Citizens for Better Forestry v. U.S. Dep't of Agric.,* 341 F.3d 961, 970 (9th Cir. 2003).  Order at *16.  The Tenth Circuit has rejected the proposition that the CEQ regulation requires environmental assessments to be provided to the public prior to the agency's decision.  *Greater Yellowstone v. Flowers,* 359 F.3d 1257, 1259 (10th Cir. 2004).  Moreover, neither of those Ninth Circuit cases considered an

OSM review of a mine plan revision, and the Department of the Interior has promulgated

agency-specific regulations implementing NEPA, which govern OSM's conduct.  46 C.F.R. Part

305.  Regarding Environmental Assessments, the regulations state in pertinent parts:

> (a)  The bureau must, to the extent practicable, provide for public notification and
> public involvement when an environmental assessment is being prepared.
> **However, the methods for providing public notification and opportunities
> for public involvement are at the discretion of the Responsible Official.**
>
> **(1)** The bureau must consider comments that are timely received, whether
> specifically solicited or not.
>
> **(2)** Although **scoping is not required**, the bureau may apply a scoping
> process to an environmental assessment.
>
> (b) **Publication of a "draft" environmental assessment is not required**.
> Bureaus may seek comments on an environmental assessment if they determine it
> to be appropriate, such as when the level of public interest or the uncertainty of
> effects warrants, and may revise environmental assessments based on comments
> received without need of initiating another comment period.
>
> (c) The bureau **must notify the public of the availability of an environmental
> assessment and any associated finding of no significant impact once they
> have been completed. Comments on a finding of no significant impact do not
> need to be solicited**, except as required by 40 CFR 1501.4(e)(2).
>
> . . .

46 C.F.R. §§ 305(a)-(c) (emphases added).  Under the regulations, which specifically

contemplate the requirements of 40 CFR § 1501.4, the methods for affording public involvement

are left to the discretion of the Responsible Official, and the Responsible Official has the

discretion to limit public involvement to notice of a completed EA/FONSI.  *Id.*  In directing

OSM to "provide public notice and an opportunity for public involvement before reaching its

decisions," Order at *16, the Court improperly revised the scope of 46 C.F.R. § 305.

There could be specific circumstances in which the minimum notice allowable under 46

C.F.R. § 305(c) would be an abuse of the Responsible Official's discretion.  But the Court made

no findings specific to this case that would sustain a directive to OSM to depart from the

provisions of 46 C.F.R. Part 305.  Indeed, the facts of OSM's remedial NEPA analysis, which

start from a baseline of an already-constructed, long operating, and three-quarters mined-out

surface coal mine, would appear to present a textbook circumstance for the application of the

minimal notice provisions allowable under 46 C.F.R. §§ 305(a)-(c).  In effect, the Court's Order

is a repeal-by-implication of the discretion afforded the Responsible Official in 46 C.F.R. §§

305(a)(second sentence), 305(a)(2)(first clause) and 305(b)(first sentence), and contradicts the

Tenth Circuit's interpretation of the CEQ regulations in *Greater Yellowstone*.  This was error.

### (5)   The Court Misapplied the Standard for Laches

The Court concluded that the equitable doctrine of laches was "inapplicable," because

OSM itself did not provide notice of OSM's mine plan review process, and because any

prejudice to Colowyo was mitigated both by Colowyo's ability to mine coal during the period of

delay and during the 120 day window afforded by the Court to perform a new NEPA analysis.

Order at *5.  On the element of undue delay, even Guardians concedes that the clock on delay

commences when a plaintiff "knew (*or should have known*) of the allegedly infringing conduct."

Dkt. 64 at 39 (emphasis added) (*quoting Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th

Cir. 2002)).

The Court did not acknowledge that the knowledge element is satisfied if Guardians

should have known it had a claim, and indeed the Court suggested that even formal legal notice

of the mine plan review might not have been sufficient: (". . . even if Guardians was aware of the

state proceedings, a proposition supported by no evidence in the record, . . . ").  Order at *8.

Moreover, the failure to examine whether and when Guardians should have known it had a claim

is all the more significant given the Court's recognition that Guardians' Director of Climate and

Energy Programs, Jeremy Nichols, knew far more, far earlier, about OSM's NEPA duties than he

had averred to the Court.  Order at *8 n. 6.  Consequently, the Court erred in its examination of

the undue delay element of laches.

As to prejudice, the Court noted Colowyo's point that had Guardians sued during the

2007-2008 window, Colowyo would have had the opportunity to mine the previously permitted

(and unchallenged) West Pit while any NEPA deficiencies in South Taylor Pit permitting were

cured.  Order at *8.  But the Court then fails to address that fact, simply noting that Colowyo was

able to continue coal mining during Guardians' long years of delay.  The Court thus noted, but

failed to respond to, Colowyo's discussion of prejudice.  Finally, the Court appears to be relying

on the 120 day delay of vacatur as mitigation for any prejudice that Colowyo may suffer.  *Id.*

But, as previously described, that arbitrary window exposes Colowyo to substantial risks and

costs that Colowyo would not have borne had Guardians timely filed suit when they should have

known they had a claim.  Consequently, the Court erred in its application of the laches standard,

and Colowyo is likely to succeed on the merits of its appeal.

### (6)     There are Serious Legal Issues Regarding Standing and Waiver

The issues of standing and waiver were thoroughly briefed to the Court, and the Court

has rendered its judgment.  Colowyo here will not rehash the arguments, but simply observe that

they present significant legal issues.  As to standing, the Court declined to address whether

Guardians needed to establish specific use and enjoyment of the affected area at the time of the

challenged decisions, concluding that Mr. Nichols' averments during all periods satisfied Article

III injury-in-fact.  Order at *6.  These jurisdictional issues (as to timing and specificity) are not

clearly delineated in the relevant case law, particularly in the context of a declarant criticized by the Court for "parsing words." Consequently, Guardians' standing will be a significant issue on appeal.

Regarding waiver, the Court concluded that waiver could not be found because events in the state proceedings are "no excuse" for OSM's failures. Order at *8. The Court cited no law for this proposition, and Colowyo respectfully submits that there are serious questions as to potential waiver under the "meaningful participation" standard, where the state and federal authorizations are so closely intertwined. *Public Citizen,* 541 U.S. at 752, 764-65 (*quoting Vermont Yankee Nuclear Power Corp.,* 435 U.S. 519, 553 (1978)). These constitute fair grounds for resolution on appeal, and justify a stay pending appeal.

**B.      The Court's Errors Cause Irreparable Harm to Colowyo and the Affected Communities**

The Court recognized that vacatur of the Mine Plan of Operation would cause immediate and serious harm to Colowyo and the affected communities, which led the Court to defer vacatur for 120 days. Order at *16. Should vacatur be entered, these harms would be irreparable, because Colowyo would have no permitted coal to mine and no recourse against any party for damages arising from the disruption of mining. This constitutes a significant near-term threat of irreparable harm. Moreover, even if vacatur is not ultimately entered, the *in terrorem* effect of the Order and Judgment inflicts unnecessary harm in the interim on the affected communities.

As to Colowyo's employees and the communities, the Court appropriately considered their welfare in selecting the 120 day remedial NEPA window. But the Court may not have fully appreciated the cloud of uncertainty and fear that the Order would precipitate. The Court chastised OSM for "rubber-stamping" the permitting work of the Colorado Division of

Reclamation, Mining, and Safety, but in recent years the coal industry has come to expect extended, multi-year struggles with environmental groups over NEPA compliance.  This has led to ever longer lead times for NEPA analyses.  In that respect, the short turnarounds for the 2007 and 2009 Colowyo and Trapper EAs are not a realistic benchmark, especially with the additional analytical scope ordered by the Court.  These concerns led to OSM's counsel estimating at oral argument that a new EA would likely take a year.  Dkt. # 75 at 109, 13:19.  The 120 day deadline thus catches OSM between an unrealistically short deadline and a newly broadened scale of analysis, and in turn has minimized Colowyo's (and OSM's) ability to provide employees and the community with any assurances that the deadline will be met with the requisite quality of discussion and response to public comment.  McCourt Decl. ¶ 4.  The community perceives itself now caught in the jaws of a national policy debate, with nothing approaching a reasonable timeline.  *Id.* ¶¶ 3-4.  Especially now that OSM has commenced the process of public notice and involvement in the remedial NEPA process, the psychic harms to the community associated with an imminent risk of shutdown can be substantially mitigated by a stay of the Order pending appeal, at little cost.

In addition, the excess scope of the Court-ordered remedial NEPA work creates an imminent and substantial threat to Colowyo's lease rights.  By holding that OSM has the discretion to condition a modified Mine Plan of Operation on the basis of combustion effects, and NAAQS compliance over-and-above Colowyo's CAA permit, the Court opens the door for OSM to require revised mining techniques, rates and amounts of mining, and mitigation measures, all of which would impose improper costs on Colowyo.  Equally importantly, the Court's directive to analyze combustion and unspecified direct air quality effects places Colowyo

under an *indefinite* threat.  With the exception of calculation of greenhouse gas emissions, there are no judicially-vetted templates for OSM to follow in analyzing many combustion effects under NEPA, such as mercury emissions.  This virtually guarantees additional litigation and uncertainty related to any analysis OSM ultimately produces.  And because the Court directed OSM to conduct this unprecedented post-hoc analysis on an arbitrary 120 day schedule (six months shorter than OSM's counsel estimated at oral argument would be necessary for the kind of analysis the Court was evaluating), the potential for error by OSM is substantial.

Guardians has contended that the costs of remedial NEPA work are not a factor in considering harm or prejudice, and this is correct as to remedial NEPA work *required by law*. But because the Court erred in directing OSM to prepare an *excessive* NEPA analysis, the significant contractor costs, risk of lease impairment, and threat to Colowyo's enormous investment in the facility are all appropriately considered irreparable harms to Colowyo.

Finally, as discussed below, a mine cannot simply freeze in place without consequence. Should vacatur be entered, Colowyo will soon be in noncompliance with a variety of permit requirements regarding maintenance of the South Taylor Pit facilities and environmental standards that are driven by and connected to the Mine Plan of Operation.  These include not only ongoing reclamation activities, which even Guardians agreed in oral argument they had no interest in delaying, Dkt. # 75 at 17, 9:20, but also requirements applicable to maintaining the integrity of the South Taylor Pit and its associated effects on hydrology, drainage and dust control.  Vacatur of the Mine Plan of Operation creates a significant risk of serial non-compliance with other permits and corresponding environmental harms, which must be considered irreparable harms for purposes of a stay pending appeal.

**C.     The Balance of Harms Favors a Stay**

The balance of harms criterion focuses on the relative harms to the party seeking the stay

as against the party that obtained the judgment appealed from.  In contrast to the significant

threats to Colowyo's lease rights, continued viability of the mine, and the community in which

the Colowyo Coal Mine is an important employer and economic contributor, Guardians' harms

from a stay are minimal.  Despite two years of litigation and access to the full Administrative

Record for both the state and federal permitting process, and repeated questioning at oral

argument, Guardians to date has been unable to identify a single change they would advocate to

the mining or reclamation plans.  They have simply failed to identify any concrete harms to their

interests resulting from OSM's alleged errors, other than the generalized public interest in NEPA

compliance, and consequently there is no basis to conclude that their specific interests would be

materially harmed by a stay pending appeal.

Indeed, even on the issue of generalized NEPA compliance, Guardians professes a strong

interest in informed decision making and public participation under NEPA.  Taking that at face

value, Guardians also has an interest in ensuring a correct scope for any remedial NEPA work, as

does Colowyo.  Consequently, the balance of harms strongly favors a stay pending appeal.

**D.     A Stay is in the Public Interest**

In the Order, the Court stressed NEPA's objectives of public involvement and informed

decision-making.  Order at *2.  These policies are equally implicated where an agency engages

in an *overbroad* NEPA analysis as they are in an unduly limited review.  An overly narrow

review deprives the public and the agency of potentially important information.  Conversely, an

overbroad scope is confusing and misleading to both the public and decision makers, in that it

burdens all parties with unnecessary material, wastes time and resources, and implies the agency has the discretion to regulate conduct where it does not.  This case is a perfect illustration of the negative effects of an overbroad conception of NEPA.  For example, Guardians has an avowed concern for coal mines' role in the attainment of NAAQS for PM 2.5 and Ozone.  Yet their focus on an overbroad interpretation of NEPA and an overbroad sense of OSM's authority led them to completely ignore the state CAA permit proceedings where emissions of PM 2.5 and ozone precursors are regulated, and exclusively regulated regarding NAAQS attainment.  Their view of NEPA on the subject is a dead end, and such misperceptions are promoted every time an agency "conservatively" examines issues that exceed the agency's regulatory authority.

These concerns are compounded by the Court's short timeline before entry of vacatur. The announcement of the Court's Order has resulted in widespread local concern about the potential imminent shutdown of the Colowyo Coal Mine, McCourt Decl. ¶ 3, exacerbated by Guardians' pronouncements that this is an opportunity to "embrace" the transition from coal, i.e., find new jobs.

The enforceability of contracts is another important public interest.  The Court has previously emphasized the importance of a thorough analysis of reasonably foreseeable environmental effects prior to leasing federal coal. *High Country Conservation Advocates*, 52 F.Supp.3d at 1193-96.  Once a lease is issued, the lessee, the leasing agency, and the general public have a right to rely on the validity of the lease terms.  In the context of a coal lease, that includes the expectation among all parties that the federal government will not impose post-hoc conditions on the lease based upon coal combustion, which was the entire purpose of the leasing action.

A stay pending appeal will allow the Tenth Circuit to opine on these issues of great

public and environmental import, at the cost of a few months of additional mining at a facility

where all the necessary infrastructure and surface disturbance has already occurred.  Indeed, the

remaining coal at Colowyo is among the *least environmentally impactful* coal that can be mined,

because so little additional disturbance is required to access it.  Individually and collectively, the

public interests justify a stay.

### CONCLUSION

For the foregoing reasons, the Court's Order and Judgment, Dkt. 78-79, should be stayed

pending appeal.

  Respectfully submitted this 29th day of May, 2015.

**DORSEY & WHITNEY LLP**

s/Stephen D. Bell
Stephen D. Bell
Scott P. Sinor
1400 Wewatta Street, Suite 400
Denver, CO 80202-
Telephone:  (303) 629-3400
Facsimile:  (303) 629-3450
E-mail:  bell.steve@dorsey.com
             sinor.scott@dorsey.com

Michael R. Drysdale
Dorsey & Whitney LLP
50 South Sixth Street
Minneapolis, MN 55402
Telephone (612) 340-5652
Facsimile: (612) 340-2868
E-mail: drysdale.michael@dorsey.com

ATTORNEYS FOR
COLOWYO COAL COMPANY, L.P.

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2015 I caused the forgoing document titled COLOWYO COAL COMPANY'S MOTION FOR STAY PENDING APPEAL to be electronically filed with the Clerk of the Court using the CM/ECF system.  Notification of such filing will be sent to the following email addresses:

**James Jay Touchtone**
**Ashley Dye Wiles**
**Samantha M. Ruscavage−Barz**
WildEarth Guardians−Denver
Email: jtutchton@wildearthguardians.org
Email: awilmes@wildearthguardians.org
Email: sruscavagebarz@wildearthguardians.org
**Attorneys for WildEarth Guardians**


John S. Most
U.S. Department of Justice-DC-7611
Email: john.most@usdoj.com
**Attorneys for Defendants**
**Kristina R. Van Bockern**
**Paul Martin Seby**
Holland &Hart, LLP−Denver
Email: trvanbockern@hollandhart.com
Email: pmseby@hollandhart.com

**Attorneys for Trapper Mining Inc.**


s/ Karen Porter
Karen Porter

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-00518-RBJ

WILDEARTH GUARDIANS,

 Plaintiff,

v.

U.S. OFFICE OF SURFACE MINING,
RECLAMATION AND ENFORCEMENT,
ERVIN BARCHENGER, Acting Western
Regional Director of the Office of Surface
Mining Reclamation and Enforcement,
Denver, Colorado, and SALLY JEWELL, in
her official capacity as U.S. Secretary of the
Interior,

 Defendants,

COLOWYO COAL CO. L.P., and TRAPPER
MINING, INC.,

   Defendant-Intervenors

---

**DECLARATION OF CHRIS MCCOURT IN SUPPORT OF**
**MOTION TO STAY PENDING APPEAL**

---

I, Chris McCourt, state and declare as follows:

1.     I am the Mine Manager of the Colowyo Coal Mine in Moffat and Rio

Blanco Counties, Colorado, owned by Colowyo Coal Company, L.P.  In my capacity as

Mine Manager, I am involved in the daily affairs of the Colowyo Coal Mine and

supervise mine operations and compliance.  As a result, I have personal knowledge of

developments related to the Colowyo Coal Mine since issuance of the Court's Order and Judgment on May 8, 2015.

2.      Since issuance of the Order and Judgment, Colowyo has devoted significant staff and financial resources to providing the Office of Surface Mining whatever factual and technical support they may need to comply with the Court's 120 day deadline for completion of a new NEPA process.

3.      I have also had numerous communications with employees, elected officials, and residents of Moffat and Rio Blanco Counties and Craig, Colorado regarding the effect of the Order and Judgment on the future of the Colowyo Coal Mine. These individuals and representatives have expressed great concern and fear regarding the potential closure of the Mine.  Employees and residents have asked whether they should begin planning to find new jobs or move.  Approximately twenty employees and residents have also indicated to me or to Colowyo's Human Resources Department that they would be postponing major purchases, such as homes, that would tie them to the community, until there is some resolution.

4.      At the same time, I have not provided any predictions as to whether OSM can meet the deadline, or whether the resulting analysis will be deemed sufficient.  My answer has been that we will all do our best, but we will not have much of an idea until close to the 120 day deadline.   As much as the adverse decision, the uncertainty regarding the deadline and ultimate result is weighing heavily on the community.

5.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

2

Executed on May 29, 2015.

s/Chris McCourt
Chris McCourt